**UNITED STATES DISTRICT
SOUTHERN DISTRICT OF NEW YORK**

---

THOMAS ALBERTO ROBLES,

                           Plaintiff,

        v.

HOLY SEE (STATE OF VATICAN
CITY; THE VATICAN); OUR LADY OF
MOUNT CARMEL PARISH; CHURCH
OF OUR LADY OF MT. CARMEL; OUR
LADY OF MT. CARMEL
DEVELOPMENT CORPORATION;
ARCHDIOCESE OF NEW YORK a/k/a
ROMAN CATHOLIC ARCHDIOCESE
OF NEW YORK; ARCHBISHOP OF
NEW YORK; and THE SOCIETY OF
THE CATHOLIC APOSTOLATE a/k/a
PALLOTTINES;

                          Defendants.

___-cv-_____

**COMPLAINT
AND JURY TRIAL DEMAND**

---

Plaintiff, Thomas Alberto Robles, by and through his undersigned counsel, alleges the following:

## NATURE OF CLAIM

1.    This case is brought under the New York Child Victims Act (L 2019, ch 11) ("CVA"). It concerns the repeated acts of sexual abuse committed by Reverend Barry F. Bossa ("Rev. Bossa") against Plaintiff, Thomas Alberto Robles, who was a minor at the times of the sexual abuse. Those acts include conduct by Rev. Bossa that would constitute a sexual offense as defined by, *inter alia*, New York Penal Law §§ 130.55, 130.80(1)(a), and 130.65(4).

2.    The subject abuse, which includes fondling, forced sexual touching, and other sexual acts, occurred when Rev. Bossa was employed by, working for, associated with, and/or on the premises of Defendant Church of Our Lady of Mount Carmel ("Mt. Carmel Church"), which is a Catholic church located in New York, New York.

3.      Upon information and belief, Rev. Bossa was ordained by The Society of Catholic Apostolate a/k/a Pallottines (the "Pallottines") in or around 1981.  Rev. Bossa was ordained by the Pallottines despite its express knowledge that Rev. Bossa had pled guilty in 1974, to performing oral sex upon a twelve-year-old boy.

4.      Upon information and belief, Rev. Bossa was employed by Defendants Mt. Carmel, Roman Catholic Archdiocese of New York (the "Archdiocese"), the Archbishop of New York (the "Archbishop"), the Pallottines, and the Holy See (State of Vatican City; The Vatican) ("Holy See") from on or about January 1, 1981, to on or about December 31, 1986.  The subject abuse occurred within said time period, beginning in 1981.

5.      Pursuant to the CVA, a victim of childhood sexual abuse in the State of New York whose claim may have been barred by the statute of limitations is now revived.  Such a claim must be brought not later than one year and six months after the CVA became law on February 14, 2019. *See* CPLR § 214-g.  Plaintiff's claim is timely.

## PARTIES

6.      Plaintiff incorporates all consistent paragraphs of this Complaint as if fully set forth.

7.      At the time of the sexual abuse alleged herein, Plaintiff, Thomas Alberto Robles, was a minor, residing within the State of New York in New York County.  Plaintiff currently resides in the State of New York in New York County.

8.      At all relevant times hereto, Rev. Bossa was a priest at Mt. Carmel Church, located at 448 East 116th Street, New York, New York 10029.

9.      Defendant Our Lady of Mount Carmel Parish ("Mt. Carmel Parish") was, and continues to be, a Roman Catholic organization and a non-profit religious corporation duly organized and existing under, and pursuant to, the laws of the State of New York, and authorized to conduct

business and conducting business in the State of New York under the direct supervision, authority, employ and control of the Archdiocese, the Archbishop, and the Holy See, with its principal place of business at 448 E. 116th St. New York, New York 10029.

10.     Defendant Mt. Carmel Church was and continues to be a Roman Catholic organization and a non-profit religious corporation duly organized and existing under, and pursuant to, the laws of the State of New York, and authorized to conduct business and conducting business in the State of New York under the direct supervision, authority, employ and control of Defendants Mt. Carmel Parish, the Archdiocese, the Archbishop, and the Holy See, with its principal place of business at 448 E. 116th St. New York, New York 10029.

11.     Defendant Our Lady of Mount Carmel Development Corporation ("MCDC") is a Roman Catholic organization and a non-profit religious corporation duly organized and existing under, and pursuant to, the laws of the State of New York, and authorized to conduct business and conducting business in the State of New York under the direct supervision, authority, employ and control of Defendants MCDC, the Archdiocese, the Archbishop, and the Holy See, with its principal place of business at 448 E. 116th St. New York, New York 10029.

12.     Mt. Carmel Parish, Mt. Carmel Church, and MCDC will also be hereinafter referred to as the "Mt. Carmel Defendants."

13.     Defendant Pallottines was and continues to be a Roman Catholic organization, religious order, and non-profit religious corporation authorized to conduct business and conducting business in the State of New York, organized and existing under the laws of the State of New York. The Pallottines is and continues to be under the direct supervision, authority, employ and control of Defendants Archdiocese, the Archbishop, and the Holy See, with a principal place of business at 3452 Niagara Falls Blvd, North Tonawanda, New York 14120.

14.     Defendant Archdiocese was and continues to be a Roman Catholic organization and a non-profit religious corporation, duly organized and existing under, pursuant to, and by virtue of the laws of the State of New York, licensed to do and/or transact business within the State of New York, and with a principal place of business at 1011 First Avenue, New York, New York 10022.

15.     The Archdiocese employed priests and others who served various Catholic institutions and families, including Plaintiff, Thomas Alberto Robles.

16.     Defendant Archbishop was and continues to be a Roman Catholic organization, currently occupied by Timothy Michael Cardinal Dolan, with a principal place of business at 1011 First Avenue, New York, New York 10022.

17.     Defendant Holy See, at all times material hereto, was and is an international religious organization and the ecclesiastical, governmental and administrative capital of The Roman Catholic Church and The Supreme Pontiff located in the Vatican City State, Italy. The Holy See is the composite of the authority, jurisdiction and religious sovereignty vested in the Supreme Pontiff and his delegated advisors and/or agents to direct the activities and business of the worldwide Roman Catholic Church.

18.     In the United States, bishops, archbishops, cardinals, and others direct, supervise, support, promote, and engage in the oversight of the Roman Catholic church and religion within the country, through unfettered control of the dioceses, archdioceses, ecclesiastical provinces, religious orders, and other related organizations, their employees, and the policies and procedures by which they provide religious and pastoral guidance, education, and counseling to United States Catholics, subject only to the authority of the Holy See itself, for which they are employees.

19.     The Holy See actively engages in commercial activity in the United States by, *inter alia,* collecting contributions from members, soliciting members to join and contribute financially, buying and selling real estate and other property, employing citizens, fundraising activities, and receiving tuition from its schools and other educational and/or extracurricular programs.

20.     One major effort further discussed below, is called "Peter's Pence" and is a collection taken up every year specifically for the support of the Holy See.  Most of the funds go to the support of the Holy See (sometimes referred to herein as the "Vatican") bureaucracy and the international diplomatic corps.  The funds are collected by individual dioceses and archdioceses and sent to the Vatican Nunciature, which is the name for the Vatican Embassy.  There the funds are banked and, periodically, the results of the collections and the interest earned are sent to the Holy See in Rome.

21.      Plaintiff's claims are based, in part, on Rev. Bossa's employment relationship with Defendant Holy See. The relevant employment relationship is not abnormal for a sovereign, as employment is not part of civil service, the diplomatic corps, or the military.  Nor was Rev. Bossa privy to governmental policy deliberations or engaged in legislative work.

22.     Defendant Holy See also engages in commercial activity in its oversight of Roman Catholic organizations worldwide, including the archdioceses, dioceses, and parishes in the United States.  Specifically, such engagement involves expansive business activity in the State of New York.  For example, Catholic archbishops and bishops are not allowed to spend over a specific amount of money without getting explicit permission of Defendant Holy See.

23.     Defendant Holy See promulgates rules, regulations, laws, opinions and edicts that it commands be followed by its archbishops, bishops, cardinals, archdioceses, dioceses, and priests in the United States.  For example, in May 2019, the Supreme Pontiff, Pope Francis, issued the

*Vos Estis Lux Mundi* regarding the lifting of certain requirements for sexual abuse investigations in which the Pope stated:

> **I desire** that this commitment be implemented in a fully ecclesial manner, so that it may express the communion that keeps us united, in mutual listening and open to the contributions of those who care deeply about this process of conversion.
>
> **Therefore, I decree**: . . .[1]

24.     In December 2019, the Supreme Pontiff, Pope Francis, issues the *Rescriptum Ex Audientia SS.MI* in which he lifted the requirement of "pontifical secret" in certain legal proceedings. [2]

25.     The Holy See also charges assessments or fees for a variety of functions, including the appointment or assignments of bishops, archbishops, cardinals, as well as, the alienation of certain ecclesiastical properties.  That money is generally paid by the archdioceses and dioceses directly to the Holy See.

26.     Defendant Holy See requires its agents and employees in charge of operations in the various geographical locations to come to Rome and report about the state of operations, including financial status and business issues.  The visits are referred to as "*Ad Limina*" visits.  These employees are required to make this visit at least once every five years.

27.     The Holy See also requires its dioceses, archdioceses, bishops, archbishops and cardinals, among others, to write detailed reports about the status of the business operations, including, but not limited to, personnel issues, finance, and real estate holdings.  These reports are known as "Quinquennial Reports" and are submitted to the Holy See every five years.

---

[1] www.vatican.va/content/francesco/en/motu_proprio/documents/papa-francesco-motu-proprio-20190507_vos-estis-lux-mundi.html (emphasis added, last visited March 6, 2020) (emphasis added).
[2] https://press.vatican.va/content/salastampa/en/bollettino/pubblico/2019/12/17/191217b.html (last visited February 27, 2020).

28.     Defendant Holy See is solely responsible for creating new divisions of its business and private enterprise, referred to as either a "diocese" or an "archdiocese" across the globe, including 197 within the United States.

29.     Defendant Holy See has created, and has the power to continue to create, all the dioceses and archdioceses in New York, including Defendant Archdiocese named herein.  Defendant Holy See can also consolidate, shut down or promote these dioceses and archdioceses.

30.     The Holy See, co-equal with its bishops, archbishops, and cardinals, has authority to perform local operations of its businesses within the United States, which include, but are not limited to:  directing Peter's Pence donation campaigns, laicization of its clergy members, dispensations from its rules and regulations, and appeals of a bishop's decision.

31.     The Holy See has control over and involvement with property owned by all Catholic entities in the United States, and specifically relevant here in the State of New York, and its permission is required for the sale or disposal of much of the property owned by Catholic entities in the United States and in the State of New York.  For example, in 2007, the current Archbishop of New York, Timothy Michael Cardinal Dolan, requested permission from Defendant Holy See to move nearly $57 million into a cemetery trust fund to protect its assets from victims of clergy sexual abuse who were demanding compensation.[3]

32.     Defendant Holy See commands that its employees and agents, including but not limited to its bishops, archbishops and priests commit to specific rules, policies, and procedures. For example, bishops, archbishops and priests must be celibate, not perform certain jobs, and Holy See controls the living arrangements of said employees.  Currently, Defendant Holy See has over one million employees and agents within the United States.

---

[3] Laurie Goodstein, *Dolan Sought to Protect Church Assets, Files Show,* N.Y. Times (July 1, 2013, https://www.ny-times.com/2013/07/02/us/dolan-sought-vatican-permission-to-shield-assets.html) (last visited January 22, 2020).

33.    Through these bishops, archbishops, and priests, the Holy See promotes the sacred liturgy, while creating, appointing, assigning, re-assigning, and retiring its clergy members, bishops, archbishops, and cardinals.  Defendant Holy See also has the final and sole power to remove individual clergy.  All bishops, archbishops, clergy, and priests vow to show respect and obedience to the Pope and their designated bishop or archbishop.  Defendant Holy See also determines whether religious orders are to be disciplined for inappropriate behavior and whether they remain in the Church following inappropriate behavior.

34.    Further, a priest receives financial support throughout the full length of his life, and he must not be deprived of his pension or his clerical status *unless* Defendant Holy See approves.

35.    The Holy See promulgates and enforces the canonical laws, rules and regulations regarding education, training, and standards of conduct and discipline and directs and mandates the morals and standards of conduct of all clergy members of the Roman Catholic Church, and does this by and through its employees, agents and instrumentalities, by enforcement of its rules and regulations written and promulgated by Defendant Holy See.  As such, the Holy See had vicarious control over Rev. Bossa from the time of his ordination as a priest, through his employment at Mt. Carmel, and after when it brought Rev. Bossa to its headquarters in Rome.

36.    Any corporations, including, but not limited to the Defendant Archdiocese, the Pallottines, and the Mt. Carmel Defendants, were and continue to be alter egos of Defendant Holy See.  Defendant Holy See retained, and still retains, complete and final control over these corporations.

37.    Defendant Holy See is the *only* entity that can make the ultimate decision regarding firing and/or laicizing a priest, bishop, archbishop, cardinal, or religious leader, including Rev. Bossa.

38.     During his pendency as a priest, and up until his death, Rev. Bossa was a fundraiser and solicitor of members for Defendant Holy See.  Rev. Bossa also represented the Archdiocese and the Archbishop, who used Rev. Bossa, along with other priests, to solicit donations which flowed to the Archdiocese and to the Holy See.  As such, the Rev. Bossa not only raised money for Defendant Holy See, but was also able to recruit numerous children, adults, and families to become paying members of Defendant Holy See's organization(s), as well as, labor contributors to the ongoing production of Mass at Mt. Carmel Church.  Defendants collectively and pursuant to the policies laid out by the Holy See, protected Rev. Bossa, among others, to protect these benefits.

39.     At all times material herein, and as part of both its course of commercial conduct and particular commercial transactions and acts, Defendant Holy See directed its agents, employees and institutions in the United States, including the Archdiocese, the Archbishop, and the Mt. Carmel Defendants, to not make public to other parishioners and the general public, the sexual abuse of children committed by its clergy members, including Rev. Bossa.  This was done to avoid "scandal" and to perpetuate its Christian public image and power to ensure the continued receipt of funds from its parishioners and other financial contributors, all in furtherance of its commercial activities.

40.     The Archdiocese, the Archbishop, the Pallottines, the Mt. Carmel Defendants, and the Holy See, together with other agents, at the direct authority of Defendant Holy See collectively create the "Church Enterprise."

41.     At all relevant times herein, during the time Rev. Bossa was employed as a priest by and serving as priest for each Defendant named herein, Rev. Bossa used his position as a priest to gain the trust of Plaintiff and his family through spiritual guidance and service to groom and to

sexually abuse Plaintiff.

42.     To  the extent that the Mt. Carmel Defendants, the Archdiocese, the Archbishop, the Pallottines, and the Holy See was/were different entities, corporations, or organizations during the period which Rev. Bossa used his position as a priest to sexually abuse Plaintiff, such entity, corporation, and/or organization is hereby on notice that it is intended to be a defendant in this lawsuit.

43.     To the extent that the Mt. Carmel Defendants, the Archdiocese, the Archbishop, the Pallottines, and the Holy See was/were a successor to a different entity, corporation and/or organization which existed during the relevant times mentioned herein, including, the times at which Rev. Bossa used his position as a priest of and associated with the above-captioned Defendants so as to sexually abuse Plaintiff such successor entity, corporation and/or organization is hereby placed on notice that it is intended to be a defendant in this lawsuit.

44.     Defendants' policies and directives to maintain secrecy of the sexual abuse of children in order to avoid scandal and maintain maximized financial contributions was, at minimum, a substantial factor in bringing about Plaintiff's abuse described below.

## JURISDICTION AND VENUE

45.     Plaintiff incorporates all consistent paragraphs of this Complaint as if fully set forth herein.

46.     Plaintiff brings this complaint under 28 U.S.C. §§ 1332 and 1331.  Plaintiff is a resident of the New York and the Holy See is a foreign state defendant subject to the Foreign Sovereign Immunities Act, 28 U.S.C. § 1602, *et. seq.* ("FSIA").  The amount in controversy exceeds $75,000.

47.     The Court has personal and subject matter jurisdiction over the Holy See pursuant

10

to 28 U.S.C. § 1330.  The Holy See is not entitled to immunity under FISA.  The Holy See has engaged, and continues to engage, in commercial activity in the State of New York and throughout the United States and because Holy See committed the tortious conduct described herein in the United States, directly and vicariously through its agents and employees. *See* 28 U.S.C. § 1605(a)(2), (5).

48.     This Court has supplemental subject matter and personal jurisdiction over the Mt. Carmel Defendants, the Archdiocese, the Archbishop, and the Pallottines pursuant to 28 U.S.C. § 1367(a).  Plaintiff's claims against those Defendants are "so related to claims in the action within such original jurisdiction that they form part of the same case or controversy[.]"

49.     Venue for this action is proper in this Court pursuant to 28 U.S.C. § 1391(f)(1), because a substantial part of the events or omissions giving rise to the claims occurred within this District, and the Defendants are subject to personal jurisdiction in this District.

50.     Defendant Holy See has unqualified power over the Roman Catholic Church within the United States including each and every individual and section of the Church including, but not limited to all priests, bishops, archbishops, metropolitans, cardinals, and all other church workers as well as dioceses, archdioceses, ecclesiastical provinces, and orders.

51.     Defendant Holy See directs, supervises, supports, promotes and engages in the oversight of the sovereign nation, the organization and its employees for the purpose of the business, foreign affairs, and employees of the worldwide Roman Catholic Church, and provides religious and pastoral guidance, education and counseling to Roman Catholics in the United States in exchange for all or a portion of the revenue collected from its members.

52.     Defendant Holy See engages in some of its activities vicariously through its agents, cardinals, bishops, and clergy, including religious order priests, brothers and sisters, and lay

employees who work under its authority in the United States, and in the State of New York. Through these individuals, and through its own actions carried out in the United States, Defendant Holy See committed, both vicariously and through its own acts and omissions, the tortious acts described herein.

53.     Ultimately, this Court has subject matter jurisdiction and personal jurisdiction over Defendant Holy See because the Holy See is responsible for the tortious acts and omissions of its agents, employees, and instrumentalities in the United States that caused personal injury to Plaintiff as described below pursuant to exceptions provided in FISA.  Such exceptions applicable herein include the "tortious acts exception" codified in 28 U.S.C. § 1605(a)(5), as here, Plaintiff was harmed by tortious acts, committed by the Holy See directly, and through the doctrine of *respondeat superior* for the tortious acts of its agents and employees in the United States. All such acts of these agents and employees were within the course and scope of their employment with the Holy See.

54.     Defendant Holy See also actively engages in commercial and business activity in the United States of America and the State of New York by recruiting and soliciting people to become members and contribute to the financial operation of the Roman Catholic Church, including The Society for the Propagation of the Faith ("SPF") in every diocese, including the Archdiocese.

55.     Each diocese/archdiocese, including the Archdiocese, has a separate SPF under the control and oversight of Defendant Holy See.  Money donated to the SPF is sent to the Pontifical Mission Societies in the United States which is headquartered in New York and which is also under the direction and control of Defendant Holy See.  The SPF takes donations and has special collections specifically for the Mission.

56.     Defendant Holy See also operates the Permanent Observer Mission of the Holy See to the United Nations which is headquartered in the Archdiocese.  As part of this Mission, the Holy See maintains a "Holy See Permanent Observer Mission Fund" in New York to fund the "ongoing work of the Permanent Observer Mission of the Holy See to the United Nations in New York."

57.     The Holy See also engages in solicitation of funds to, among other places, the United States and New York through the Peter's Pence Collection ("Peter's Pence").[4]  According to the requirements of the Peter's Pence, each church member is encouraged to provide an offering to the Pope "so that he can provide for the needs of the entire Church[.]"

58.     Peter's Pence is a commercial transaction wherein Defendant Holy See asks for donations in exchange for spreading the evangelization of the Church.  As Pope John Paul II stated:

> Many expect the Apostolic See to give them the support they often fail to find elsewhere. In this perspective the Peter's Pence Collection is a true and proper participation in the work of evangelization, especially if one considers the meaning and importance of concretely sharing in the concerns of the universal Church."[5]

59.     In the United States, Defendant Holy See conducts its Peter's Pence activity through the United States Conference of Catholic Bishops ("USCCB") which states that "[t]he purpose of the Peter's Pence Collection is to provide the Holy Father with the financial means to respond to those who are suffering as a result of war, oppression, natural disaster, and disease.  The USCCB National Collections Committee oversees the promotion of the Peter's Pence."[6]  Indeed, United States Catholics are encouraged to send their donations by mail to an address for "Peter's

---

[4] http://www.peterspence.va/en.html (last visited February 27, 2020); http://www.vatican.va/roman_curia/secretar-iat_state/obolo_spietro/documents/index_en.htm
(last visited February 27, 2020)
[5] Pope John Paul II to the St Peter's Circle, 28 February 2003,
http://www.vatican.va/roman_curia/secretariat_state/obolo_spietro/documents/actual_en.html  (last  visited February 10, 2020).
[6] http://www.usccb.org/catholic-giving/opportunities-for-giving/peters-pence/ (last visited February 27, 2020).

Pence Collection, The Apostolic Nunciature" in Washington, DC.

60.     The USCCB, as an organization carrying out the actions of and serving Defendant Holy See, also hosts a collection of resources to encourage collection in diocese and individual churches, including a social media tool kit, parish materials,[7] diocesan materials, all displaying pictures of the Supreme Pontiff of the Holy See, Pope Francis.  Indeed, the Pope repeatedly "calls each of us to … respond with faith and charity" and "reminds us that Christ bids us to spend our lives in his service" invoking the authority of the "Apostolic Exhortation *Gaudete et Exsultate,* no. 98."

61.     According to the USCCB website, the "Peter's Pence Collection" has raised over $190 million[.]"*See* footnote 6 below.  This money was raised through efforts by employees and agents of Defendant Holy See within the United States, and specifically the State of New York, to solicit funds for Defendant Holy See in exchange for the religious blessings associated with following Christ's edicts.

62.     Defendant Holy See also has a significant seminary system and "Program of Priestly Formation" concerned with recruiting and training employees and agents to further the commercial purpose in the United States of gathering money and recruiting new members to the Church.  The Holy See exerts control over this system. For example, in the 5th edition of the "Program of Priestly Formation" it is stated:

> In 1981, Pope John Paul II **mandated** an apostolic visitation of all United States seminaries. The visitations resulted in observations published by the Congregation for Catholic Education on freestanding diocesan seminary theologates (1986), college seminaries (1988), and religious priestly formation (1990) in collaboration with the Congregation for the Institutes of Consecrated Life and Societies of Apostolic Life. These observations played an important role in shaping the fourth edition

---

[7] *See e.g.* http://www.usccb.org/catholic-giving/opportunities-for-giving/peters-pence/collection/2019/upload/pp-2019-parish-resource-guide.pdf (last visited February 27, 2020).

of the PPF[.][8]

63.     In fact, footnote 6 on page 3 of that same document references Code of Canon law § 242 which makes clear that the seminary program is mandated by Defendant Holy See: "Each nation is to have a program of priestly formation which is to be established by the conference of bishops, attentive to the norms issued by the supreme authority of the Church, and which is ***to be approved by the Holy See***. . . ."  Canon 242, § 1 (emphasis added).

64.     The enrollment of students at these seminaries, or any other Roman Catholic schools, as well as, the donation of money by parishioners is harmed by any hint that the Church or Pope are not pure, scandal-free, and a source for spiritual growth.  As such, to support the commercial mission of the Holy See, it mandates absolute secrecy in many things, including steps taken to protect the Church—that is, to protect the commercial enterprise— regarding priests accused of childhood sexual abuse.  As is stated in the 1962 *Crimen Sollicitationis* No. 70: "All these official communications shall always be made under the secret of the Holy Office; and, since they are of **the utmost importance for the common good of the Church**, the precept to make them is binding under pain of grave [sin]."[9]

65.     For these reasons, this Court has jurisdiction over Defendant Holy See because said Defendant engaged in commercial activity in New York State bringing them into New York's Long Arm Statute as well as through its intentional and widespread commercial activity throughout the United States of America and its territories.

---

[8] http://www.usccb.org/beliefs-and-teachings/vocations/priesthood/priestly-formation/upload/ProgramforPriestlyFormation.pdf pg. 2, (last visited February 27, 2020).
[9] http://www.vatican.va/resources/resources_crimen-sollicitationis-1962_en.html (last visited March 6, 2020) (emphasis added).

## FACTS COMMON TO ALL COUNTS

**a.    The Roman Catholic Church's Structure and Policies Regarding Childhood Sexual Abuse**

66.    The papacy of the Roman Catholic Church is the oldest, continuing, absolute Monarchy in the world, and for many of its followers, the Pope is the infallible interpreter of Christ and such position is supported by the Church's own teachings, writings, and laws.

67.    As overseer of the Church, Defendant Holy See is a unique entity, with an organizational structure and chain of command that allows its head of the state, the Pope, to have a significantly high level of involvement in and control over the routine and day-to-day activities of its employees, agents and instrumentalities, such as bishops, archbishops, cardinals, and others, particularly with respect to the handling of clergy who have engaged in certain specified conduct.

68.    As previously stated, Defendant Holy See promulgates and modifies the Roman Catholic Church's overarching Canon Law (among other guiding principles), a specialized religious legal system that has touched on the issue of sexual abuse of minors since as early as the first century.

69.    The Roman Catholic Church initiated, and continues to develop, various organizational laws and management policies regarding pedophilic and sexual behaviors of its clergy members.  Defendants' policies, regulations, and laws were codified into one document: The Code of Canon Law (1917) (hereinafter "Canon").  Among other things, the Canon specifically forbade priests and clergy members from having sexual relations or relationships with children under the age of sixteen.  The Canon mandated absolute secrecy before, during, and after the proceedings of the ecclesiastical courts.  This was known as pontifical secrecy.  The Canon also provided cover for offending priests through confession, exhibiting no concern for physical or spiritual care of the

victims.  Today, in the current 1983 version of the Canon, the sexual abuse of children by priests and clergy members continues to be expressly forbidden.

70.     These Canon rules and policies are mandatory and must be obeyed by every member of the Roman Catholic Church at the behest of Defendant Holy See, which are its dioceses, archdioceses, bishops, archbishops, cardinals, and priests, including the remaining Defendants named herein.

71.     In 1962, Defendant Holy See released a document or "instruction" entitled *Crimen sollicitationis.*[10]  This document codified procedures to be followed by bishops and archbishops in cases of clergy members accused of having used the confessional process to make sexual advances to penitents, including minors, as well as, non-confessional sexual conduct with minors. This document requires strict secrecy in such cases, allowing its institutions and employees, including the Church Enterprise defendants herein, to conceal this known problem.

72.     Defendant Holy See knew its widespread problem of sexual abuse of minors by clergy members was worldwide, and particularly in the United States, and provided a mandated policy for the Archdiocese, the Archbishop, the Mt. Carmel Defendants, and the Pallottines, which gave its clergy members and institutions the ultimatum of secrecy or excommunication.  This in turn created a shroud of secrecy and sequestered priests, such as Rev. Bossa, from consequence.

73.      On June 28, 1988, Defendant Holy See issued an apostolic constitution entitled *Pastor Bonus*[11] ("The Good Shepherd") that reiterated the Defendant Holy See's Congregation for

---

[10] The Vatican site provides a copy of the text of the *Crimen sollicitationis* at: http://www.vatican.va/resources/resources_crimen-sollicitationis-1962_en.html (last visited March 6, 2020). The original *Crimen* was issued in 1922, and its only difference from the 1962 version was the addition examples of the formularies to be used in the child sexual abuse judicial process.

[11] The  Vatican site provides a copy of the text of the *Pastor Bonus* at: http://www.vatican.va/content/john-paul-ii/en/apost_constitutions/documents/hf_jp-ii_apc_19880628_pastor-bonus-index.html (February 27, 2020).

the Doctrine of Faith's[12] ("Congregation") absolute power over crimes against morals, including sexual abuse of minors by clergy members.

74.     Defendant Holy See claims its policies forbid child sexual abuse by clergy members, but in reality, its policy, as implemented by its employees, agents, instrumentalities, and institutions, is to protect its abusive priests, clergy members, bishops, archbishops, cardinals, and other agents and employees from "scandal."  This secret internal policy is done in order to maintain the Pope's rightful claim of control and ensure its parishioners, followers, and financial contributors to keep confidence in Defendant Holy See and the Catholic Church as a whole.  In doing so, Defendant Holy See continues to receive vast contributions of money and property by those devout to it.

75.     Organizations and employees, including the Defendants named herein fully embraced and implemented the policies and procedures of Defendant Holy See which provided for *mandatory* secrecy of all administrative, legislative, and judicial activities of the Holy See offices and departments under direct authority of the Pope, as well as overall similar activities in the dioceses around the world, including those in the State of New York, specifically the Archdiocese, the Archbishop, the Mt. Carmel Defendants, and the Pallottines. Violation of pontifical secrecy can result in severe penalties, including excommunication.

76.     At all times relevant herein, Defendant Holy See employed priests, including Rev. Bossa, to provide religious and pastoral services.  At no time did Rev. Bossa, perform legislative work or governmental functions on behalf of Defendant Holy See.

---

[12] The Congregation for the Doctrine of the Faith is the oldest among the nine congregations of the Roman Curia, seated at the Palace of the Holy Office in Rome.  It is a body of the Holy See founded by Pope Paul III in 1542 with the sole objective to "spread sound Catholic doctrine and defend those points of Christian tradition which seem in danger because of new and unacceptable doctrines."

77.     Defendants collectively controlled Rev. Bossa, were responsible for punishment if there was wrongdoing, and provided pay and room and board to Rev. Bossa for his services.

78.     Defendants collectively controlled all and/or some aspects of Rev. Bossa's conduct, including his clothing, routine, money-earning opportunities, practices, liturgical content, and teachings.

79.     Defendant Holy See, through its institutions, the Archdiocese, the Archbishop, the Mt. Carmel Defendants, and the Pallottines also supplied Rev. Bossa with material for their fund-raising, recruitment of new parishioners, and solicitation of money and property.  Defendant Holy See *alone* had the sole authority to remove Rev. Bossa from his position as a priest.

80.     Plaintiff, among others, was harmed and continues to be harmed as a result of Defendants' collective practice and policy, implemented by Defendant Holy See, of not reporting suspected child abuse to law enforcement, not warning parishioners of the danger posed by the priests, and requiring mandatory secrecy of all its agents and employees.

**b.      The Sexual Abuse Resulting from Defendants' Collective Acts and Omissions**

81.     In 1974, Rev. Bossa pled guilty in Malone, New York, to misdemeanor sexual abuse, reduced from a felony charge, for performing oral sex on a twelve-year-old boy.

82.     A Pallottines official admitted the order was aware of the conviction before it ordained him in 1981.[13]

83.      Seven years after his guilty plea, in 1981, Rev. Bossa was ordained for the Pallottines and retained as employee and agent of Defendants as a priest, counselor, and teacher educated by and under the direct supervision, authority, employ, and control of the Defendants.

---

[13] *See* "In the Shadow of the Vatican: Accused Clerics Serving in Rome, Heart of Catholic Church," Dunklin, R., Dallas Morning News, Sept. 12, 2004.

84. Following Rev. Bossa's ordination, he was authorized to represent himself as priest of Defendants, to wear the uniform or vestments of a priest, to teach and counsel the public, including minors, on behalf of Defendants and to otherwise exercise the rights, privileges, and responsibilities of Roman Catholic priests under the guise of the Roman Catholic religion.

85. Upon information and belief, the Pallottines, in conjunction with the Holy See, the Archdiocese, and the Mt. Carmel Defendants accepted Rev. Bossa for continued service because he promised not to relapse.

86. Despite the guilty plea and despite Defendants' contemporaneous knowledge of Rev. Bossa's pedophilic proclivities, Defendants employed Rev. Bossa and held him out to be an outstanding clergy member of the Roman Catholic Church. Such employment began at his assignment at St. Thomas Aquinas in Bridgewater, Massachusetts, where he was accused of sexually abusing two boys, ages eight and ten, during his time at the parish.

87. Upon information and belief, Defendants did not take any precautions regarding Rev. Bossa's private, one-on-one access to children.

88. His list of assignments, decided by Defendants, included an assignment at Mt. Carmel Parish, beginning in 1981, with access to young, vulnerable children trying to pursue a Catholic faith, including Plaintiff.

89. Beginning in or about 1981, Plaintiff started his tenure as an altar boy at Mt. Carmel in New York, New York under Rev. Bossa.  Almost immediately, Rev. Bossa began to grope and masturbate Plaintiff's genitals in the Church Rectory, in the "big meeting room" at the Church, and in the altar server changing room.

90. Plaintiff was also forced to endure other sexual abuse by Rev. Bossa until he was satisfied.

91. Rev. Bossa would often take Plaintiff out of his communion classes so they could "talk," but instead, Rev. Bossa would continue sexually abusing Plaintiff in private.

92. Plaintiff experienced more than 50 instances of sexual abuse at the hands of Rev. Bossa.

93. Rev. Bossa used the trust and spiritual guide/father-figure relationship inherent in the dynamic between priest and altar boy/parishioner to threaten Plaintiff, telling the young boy that he would not be allowed to participate in communion or confirmation if he told anyone about the incidents. The foregoing instances of abuse *merely summarize* the torture and horror that Plaintiff experienced at the hands of his Rev. Bossa.

94. In 2002, Rev. Bossa's criminal history, along with new claims of sexual abuse, was brought to public light. As a collective effort of the Church Enterprise, the Holy See directed Rev. Bosa to relocate to the Holy See's headquarters in Rome. Rev. Bossa died under Defendants' protection in 2007.

95. At all times material hereto, Defendants allowed Rev. Bossa to have unsupervised and unfettered access to children in the Archdiocese, including Plaintiff.

96. By placing Rev. Bossa and allowing him to work with children of the Catholic Church, and by allowing Rev. Bossa to recruit and solicit children to become members, Defendants represented to minor children and their families, including Plaintiff herein, that Rev. Bossa did not have a history of molesting children, was not a danger to children, and that Defendants did not have knowledge of these facts.

97. All Defendants were, and are, in a specialized position wherein they possessed knowledge that Plaintiff did not possess. All Defendants were in a position to have this knowledge because they were Rev. Bossa's employer, responsible for Rev. Bossa's conduct in the course and

scope of his priestly duties, knew about his prior conviction, and because its policies mandated and continue to mandate secrecy with respect to the sort of knowledge learned about Rev. Bossa's deviant behavior.

98.    Plaintiff, on the other hand, was a child.  As a child, he was not in a position to have information about Rev. Bossa's molestation of other children or Defendants' knowledge of the dangers that Rev. Bossa posed to children, nor was he in a position to know that Defendants mandated that its employees keep such knowledge from others, including Plaintiff.

99.    The Pallottines , the Mt. Carmel Defendants, the Archdiocese, and the Archbishop all failed to warn, in any way, Plaintiff about Rev. Bossa and, instead, made explicit and implicit representations regarding safety of the Church, altar boy program, and the clergy to Plaintiff's parents/caregivers with the knowledge and intent that they would be communicated to the minor Plaintiff to induce him to work as an altar boy, among other things.

100.    Defendants also knew or should have known that the representations made to Plaintiff's parents/caregivers would influence the amount and type of time spent alone with Rev. Bossa, Rev. Bossa's access to Plaintiff, and Rev. Bossa's ability to molest Plaintiff.

101.    A a direct and proximate result of Defendants' acts, omissions, negligence, gross negligence and conduct described herein, the Plaintiff sustained both physical and emotional injuries, including conscious pain and suffering; physical injuries to Plaintiff's body, including, but not limited to, headaches, nausea, loss of sleep and physical shock to the nervous system, as well as, injuries suffered at the times of the sexual abuse; loss of faith and mistrust of the Roman Catholic Church and its institutions; mental anguish, emotional distress, inconvenience, loss of enjoyment of life, humiliation, embarrassment, loss of self-esteem, disgrace, guilt and shame; past,

present and future physical pain and suffering; past, present and future medical expenses; past, present and future lost wages, loss of earnings and earning capacity.

**FIRST CAUSE OF ACTION**
**(As to ALL Defendants)**
**(Negligence)**

102.    Plaintiff incorporates all consistent paragraphs of this Complaint as if fully set forth under this count.

103.    At all relevant times herein, Defendants held themselves and their institutions out to be safe places for religious worship, spiritual development and growth, learning and education, or engaging in youth and/or community activities.

104.    Defendants explicitly and implicitly represented to Plaintiff that all of its clergy and staff members, including Rev. Bossa, were benevolent and trustworthy stewards of the faith who would only act in the best interests of the children whom they served. The Archdiocese did so by assigning Rev. Bossa to Defendant Mt. Carmel church, and each and every Defendant did so by allowing Rev. Bossa to perform mass and bless the food, providing him with income and living, providing him with priestly garb, and allowing him unfettered access to the children of the Church and Archdiocese, including Plaintiff.

105.    Defendants had and/or assumed a duty to provide a reasonably safe environment for Plaintiff and assumed the duty to protect and care for him.

106.    Pursuant to common law and the Restatement (Second) of Agency, § 219, Rev. Bossa was acting as the agent of Defendants because while engaging in the wrongful acts with Plaintiff, Rev. Bossa was in the course and scope of his employment acting as a counselor, priest and educator of Plaintiff and with Defendants; and/or was able to accomplish the sexual abuse because of his job-created authority and role as an agent of the Defendants.  As such, Defendants

are vicariously liable for the acts of Rev. Bossa through the doctrine of *respondeat superior*, in addition to their direct liability described here and below.

107.    Defendants knew, or should have known, that there was an unreasonable risk of harm for children participating in Catholic programs and activities within Mt. Carmel Church, involving Rev. Bossa.

108.    Defendants knew that the Roman Catholic Church generally, and the Archdiocese specifically, has had numerous employees and/or agents who had sexually molested children.  Defendants knew, or should have known, that child molesters have a high rate of recidivism and that a specific danger of child sex abuse of altar boys and/or minors existed in youth programs and activities with regard to Rev. Bossa.

109.    However, despite this knowledge, along with the direct knowledge that Rev. Bossa plead guilty to sexual acts against a child prior to ordination, Defendants unreasonably deemed that Rev. Bossa was fit to work with children; and/or that any previous suitability problems Rev. Bossa had were fixed and cured; and/or that Rev. Bossa would not sexually molest children; and/or that Rev. Bossa would not injure children.

110.    Defendants' actions created a foreseeable risk of harm to Plaintiff.  As a minor child participating in the programs and activities Defendants offered to minors, such as that of an altar boy, Plaintiff was a foreseeable victim.  As a minor child who Rev. Bossa had access to through Defendants' facilities and programs and who looked at Rev. Bossa as a communication channel to God, Plaintiff was a foreseeable victim.

111.    The kind of conduct engaged in by Rev. Bossa was foreseeable, before, during, and after the conduct was brought to the attention of church officials. At some time before and/or

during Rev. Bossa's sexual abuse of minors, including Plaintiff, Defendants knew or should have known of the dangerous propensities of Rev. Bossa.

112.    Defendants owed a duty of care to all minor persons, including Plaintiff, who were likely to come within the influence or supervision of Rev. Basso, in his role as teacher, priest, counselor,  employee, agent, and/or servant.

113.    Pursuant to Restatement (Second) of Torts, § 317, Defendants had a duty, as masters of Rev. Bossa, to exercise reasonable care to control Rev. Bossa while he was on Defendants' premises—that is, Mt. Carmel Church, and accompanying grounds, even where acting outside the scope of their employment, to prevent Rev. Bossa from intentionally harming others, including Plaintiff.

114.    Defendants accepted responsibility for the well-being of Plaintiff, as a minor child. As such, Defendants had a duty to provide the type of care required of one who requests to be entrusted with the responsibility of caring for young children.

115.    Defendants owed duties to Plaintiff arising from the relationship akin or that of a student-school, and/or parishioner-priest, and thus, all of the Defendants were required and obligated to protect the children under their tutelage, including Plaintiff.  Such duties include, but are not limited to, a duty to provide safe care, custody and control of minor children, including Plaintiff, a duty to warn of and report to the proper authorities the known deviant propensities of Rev. Bossa, and ultimately to prevent sexual, physical, and mental abuse of all minors within their care, control and/or custody, including Plaintiff.

116.    Rev. Bossa's forcible sexual acts on Plaintiff were performed in the course and scope of his delegated duties and authority granted by the Defendants.

117.    Defendants, their agents, employees, servants and licensees, including vicariously through employee Rev. Bossa, breached their duties of care owed to Plaintiff; including, *inter alia*:

a.  failing to investigate the background and/or history of Rev. Bossa before placing him into close contact with minors, including, Plaintiff;

b.  failing to warn Plaintiff, his parents and/or legal guardians, of Rev. Bossa's conduct and/or the reasonably foreseeable risk of future harm, despite Defendants having actual or constructive knowledge of Rev. Bossa sexually abusing children, having the propensity to sexually abuse children, and/or posing as a threat of sexual abuse to children;

c.  permitting and/or directing Rev. Bossa to have private contact with then minor-Plaintiff despite having constructive or actual knowledge of Rev. Bossa sexually abusing children, having a propensity to sexually abuse children, and/or posing as a threat of sexual abuse to children;

d.  minimizing, ignoring and/or excusing the misconduct of Rev.  Bossa as described herein, which allowed such conduct to continue;

e.  failing to provide a safe environment to Plaintiff within the churches, sacristies, schools and rectories that they operated and/or owned;

f.  failing to conduct a reasonable investigation of abuse complaints;

g.  failing to create, institute, and/or enforce rules, policies, procedures, and/or regulations to prevent Rev. Bossa's sexual abuse of Plaintiff; and

h.  failing to exercise reasonable care to control Rev. Bossa to prevent his sexual abuse of Plaintiff while on Defendants' premises;

118.   Defendants further breached their duties of care when, *inter alia,* with knowledge of Rev. Bossa's proclivities, Defendants:

      a.   transferred and/or re-assigned Rev. Bossa without warning about his proclivities;

      b.   placed Rev. Bossa in "treatment" or on "sick leave;" and then allowed Rev. Bossa to continue as a clergy member;

      c.   allowed Rev. Bossa to continue contact with children (including Plaintiff) after it was known he had sexually abused a child;

      d.   failed to report Rev. Bossa's activities to law enforcement and parents (including Plaintiff's parents); and

      e.   moved Rev. Bossa to Vatican City to be protected from prosecution while covering up Rev. Bossa's continuing sexual abuse of children by failing to release information regarding Rev. Bossa's known abuses.

119.   Given the criminal record of Rev. Bossa, Defendants were, at minimum, unreasonable in failing to warn Plaintiff or his parents that Plaintiff would be foreseeably in contact with Rev. Bossa, as an agent and employee of Defendants.

120.   Defendants had a duty of, at minimum, ordinary care, which included investigating reports and allegations of sexual misconduct and a corresponding duty to act in accordance with their findings.  This duty would encompass the duty to report sexual abuse to the proper civil, criminal, and religious authorities, removing Rev. Bossa from the parish, or at minimum, from contact with children, notifying congregations of abuses and the present dangers of having such a priest around children, and providing help to victims of a sexually abusive clergy member.  Defendants breached these duties.

121.    In the above ways, amongst others, Defendants failed to exercise the degree of care that a reasonably prudent person would have exercised under similar circumstances, thereby, breaching their duties owed to Plaintiff.

122.    As a direct and proximate result of the above mentioned breaches of duty by Defendants and their agents, servants, workers, or employees and/or others, including but not limited to Rev. Bossa, for whose acts or omissions they are responsible, and those whose identities are in the exclusive control of Defendants, Plaintiff experienced and suffered from sexual abuse at the hands of Rev. Bossa, as well as the ensuing physical, mental, and financial injuries and damages discussed herein, which Plaintiff still continues to suffer.

123.    Further, Defendant Holy See is vicariously liable through the doctrine of *respondeat superior* for the breach of duties discussed above by its employees and agents, including but not limited to, Rev. Bossa, the Mt. Carmel Defendants, including other ordinaries, as well as, the Archbishop and the Archdiocese, who asserted control over all clergy below the Archbishop in the Archdiocese, including Rev. Bossa, and the operations of the Mt. Carmel Church and Mt. Carmel Parish.

124.    As direct and proximate result of Defendants foregoing acts and omissions, as described herein, Plaintiff sustained both physical and emotional injuries, including, humiliation, embarrassment, loss of self-esteem, disgrace, guilt and shame; loss of faith and mistrust of the Roman Catholic Church and their agents and institutions; injuries suffered at the time of the sexual abuse including physical shock to the nervous system and emotional distress; pain and suffering; severe mental anguish and trauma, necessitating psychiatric and medical care and treatment in the past, present and/or in the future; physical ailments, including, but not limited to headaches, nausea, mental anguish, anxiety and loss of sleep; loss of earnings and earning capacity during those

periods Plaintiff was unable to work due to traumatization, and may in the future be unable to work; and grievous bodily pain and suffering, mental anguish, inconvenience, and loss of enjoyment of life, in an amount that exceeds the jurisdictional limits of all lower courts that may otherwise have jurisdiction.

125.   This action falls within one or more of the exemptions set forth in CPLR § 1602.

126.   To the extent Defendant Holy See is found not to be directly liable for the above-described failures, the Holy See is vicariously liable for the acts and omissions of its employees, agents, the Mt. Carmel Defendants, the Archdiocese, the Archbishop, and the Pallottines pursuant to the doctrine of *respondeat superior*.

### SECOND CAUSE OF ACTION
### (As to ALL Defendants)
### (Negligent Training/Supervision/Retention)

127.   Plaintiff incorporates all consistent paragraphs of this Complaint as if fully set forth under this count.

128.   Rev. Bossa was employed by Defendants and was under each Defendants' direct supervision, employ, and control when he committed the wrongful acts alleged herein.  Rev. Bossa engaged in the wrongful conduct while acting in the course and scope of his employment with Defendants and/or accomplished the sexual abuse by virtue of his job-created authority.

129.   Defendants, through its employees and agents, had a duty arising from their employment of Rev. Bossa, to ensure that he did not sexually molest and abuse children in their care and/or on their premises.

130.   Defendants owed a duty to train and educate employees and administrators and establish adequate and effective policies and procedures calculated to detect, prevent, and address inappropriate behavior and conduct between clerics and children.

131.    Defendants breached their duties to instruct, train and supervise their employees, in that Defendants failed to exercise the degree of care that a reasonably prudent person would have exercised under similar circumstances, including, *inter alia*:

a.   failing to timely and properly educate, train, supervise, and/or monitor their agents or employees with regard to policies and procedures that should be followed when sexual abuse of a child is suspected or observed;

b.   failing to supervise, monitor, and/or investigate Rev. Bossa in his interactions with children when Defendants knew or should have known that such supervision was necessary given unreasonable risk of harm posed by Rev. Bossa;

c.   failing to train employees on rules, policies, procedures, and/or regulations to prevent Rev. Bossa's sexual abuse of Plaintiff;

d.   failing to properly supervise Rev. Bossa such that the opportunity for repeated, unfettered private access between Plaintiff would not be available; and

e.   failing to take reasonable steps to remove Rev. Bossa from the types of duties and circumstances which allowed him the opportunity to continue sexually abusing minors, including Plaintiff;

132.    Defendants breached their legal duty of due care owed to Plaintiff as a member of Mt. Carmel Church. Defendants breached this duty as they failed to adequately evaluate, and qualify Rev. Bossa post-hiring, monitor, supervise, influence, control, discipline or discharge Rev. Bossa and/or report Rev. Bossa to criminal authorities and/or parents or otherwise restrict his movement and/or activities to ensure the safety of the children of the Catholic parishioners, specifically Plaintiff, in the ways discussed herein.

133.     Defendants and their agents and/or employees, knew, or should have known, of Rev. Bossa's deviant sexual proclivities, propensities and/or criminal misconduct prior to employing or placing Rev. Bossa in the Mt. Carmel community in positions of trust with minors like altar boys.  Unfortunately, Defendants placed and maintained Rev. Bossa in positions of trust and control with access to children, which ultimately led Rev. Bossa to access and harm Plaintiff.

134.     Defendants, after placing Rev. Bossa, and with knowledge of Rev. Bossa's deviant behavior negligently retained Rev. Bossa in a position where he had access to children and could foreseeably cause harm which Plaintiff would not have been subjected to had Defendants exercised reasonable care.

135.     In failing to timely remove Rev. Bossa from working with children, Defendants failed to exercise the degree of care that a reasonably prudent person would have exercised under similar circumstances.

136.     As a direct and proximate result of the foregoing acts and omissions by Defendants, Plaintiff sustained both physical and emotional injuries, including, humiliation, embarrassment, loss of self-esteem, disgrace, guilt and shame; loss of faith and mistrust of the Roman Catholic Church and their agents and institutions; injuries suffered at the time of the sexual abuse including physical shock to the nervous system and emotional distress; pain and suffering; severe mental anguish and trauma, necessitating psychiatric and medical care and treatment in the past, present and/or in the future; physical ailments, including, but not limited to headaches, nausea, mental anguish, anxiety and loss of sleep; loss of earnings and earning capacity during those periods Plaintiff was unable to work due to traumatization, and may in the future be unable to work; and grievous bodily pain and suffering, mental anguish, inconvenience, and loss of enjoyment of life,

in an amount that exceeds the jurisdictional limits of all lower courts that may otherwise have jurisdiction.

137.     Defendants acts and omissions were a foreseeable, direct, and proximate cause of the occurrence and Plaintiff's resulting injuries and damages therefrom.

138.     By reason of the foregoing, Plaintiff is entitled to recover all of his damages from the Defendants, the amount of which exceeds the jurisdictional limits of all lower Courts.

139.     To the extent Defendant Holy See is found not to be directly liable for the above-described failures, the Holy See is vicariously liable for the acts and omissions of its employees and agents, the Mt. Carmel Defendants, the Archdiocese, the Archbishop, and the Pallottines, pursuant to the doctrine of *respondeat superior*, and the injuries proximately caused by such conduct.

### THIRD CAUSE OF ACTION
#### (As to ALL Defendants)
#### (Gross Negligence)

140.     Plaintiff incorporates all consistent paragraphs of this Complaint as if fully set forth herein.

141.     Defendants acts and omissions, as previously described, were committed with reckless disregard for, and with willful, wanton, and conscious indifference to, the rights, safety, and welfare of Plaintiff and the general public.

142.     The nature of Defendants aforesaid wrongful acts and omissions were of such a nature as to constitute gross negligence and malice.

143.     Defendants undertook a continuous course of action in the form of conscious decisions, with subjective knowledge and awareness of the risks and hazards presented by each decision as discussed above and incorporated herein, to expose Plaintiff and others to sexual abuse and/or sexual assault by a known sexual abuser, Rev. Bossa, and without exercising slight care or

diligence.

144. Defendants had a duty to exercise reasonable care in relation to the safety and welfare of their young parishioners, including Plaintiff.

145. Defendants had a duty to exercise reasonable care to avoid creating or maintaining unreasonable risks to the safety and welfare of the young children enrolled in their institutions, young children seeking religious counseling, and their minor parishioners, including Plaintiff.

146. Defendants had a duty to exercise reasonable care in investigating and pursuing complaints of criminal conduct, sexual misconduct, and violations of law against the young children enrolled in their institutions, young children seeking religious counseling, and their minor parishioners, including Plaintiff.

147. In addition to the common law duty of ordinary care discussed above, and incorporated herein, Defendants also had a duty that arose because of, *inter alia*, a special relationship, parishioner-parish relationship, and/or parishioner-priest relationship, and the monetary offerings and tithing paid by Catholic parishioners throughout the dioceses in the United States, and specifically the State of New York, which Defendants accepted to fund and promote their own initiatives.

148. Defendants breached their duty of care by acting with reckless disregard of the safety and welfare of Plaintiff and other innocent children by failing to properly investigate and report the known and tolerated pedophile activities of their clergy members, including those of Rev. Bossa and by placing their own personal interest in front of the safety of the young children enrolled in their institutions, young children seeking religious counseling, and their minor parishioners, including Plaintiff.

149. Defendants were more concerned with their reputation than protecting children, including Plaintiff. Such conduct was, and is, wanton and willful, reckless, and in conscious

disregard of the safety of innocent children, including Plaintiff.

150.     Defendants foregoing acts and omissions, involved reckless disregard of or indif-ference to an extreme degree of physical, mental, and psychological risk and danger, considering the probability and the magnitude of the potential harm to others.

151.     Defendants' foregoing gross negligence was a foreseeable, direct, and proximate cause of the occurrence and Plaintiff's injuries and damages therefrom.

152.     As a direct and proximate result of the Defendants acts and omissions, Plaintiff suffered sexual abuse at the hands of Rev. Bossa, as well as the ensuing physical, mental, and financial injuries and damages discussed herein, which Plaintiff still continues to suffer.

153.     That by reason of the foregoing, Plaintiff is entitled to recover all of his damages from the Defendants.

### FOURTH CAUSE OF ACTION
#### (As to ALL Defendants)
**(Breach of Contract)**

154.     Plaintiff incorporates all consistent paragraphs of this Complaint as if fully set forth under this count.

155.     A contract was formed between Plaintiff, his family, and Defendants when Plain-tiff's family agreed to place their child in Rev. Bossa's care and provide to the Church Enterprise donations and Plaintiff's labor as an altar boy in exchange for spiritual guidance, teaching, and protection from the risks and harms to which Plaintiff may have been subjected to on the street. The Church Enterprise induced Plaintiff's participation in this implied contract, in part, by holding Rev. Bossa out to Plaintiff, his family and the community, as trustworthy and competent to fulfill their promise.  Plaintiff was both a party to and an intended beneficiary of this contract.

156.    At all relevant times herein, such contract included an implicit duty of good faith and fair dealing.

157.    Plaintiff and his family performed this contract by providing continued support to the Defendants through donations and tuition for continuing catholic education classes, as well as, Plaintiff's work as an altar server and helper at the Church.

158.    As a part of this ongoing contract with Plaintiff, implied terms were created, of which Defendants had a duty to uphold and perform, which include, but are not limited to:

   a.   Keeping Plaintiff safe from being sexually assaulted as a minor;

   b.   Employing priests who were not child sexual predators;

   c.   Properly supervising their employees who were working with minor children, including Plaintiff, and who they place into their institutions;

   d.   Sharing their knowledge of their priests' deviant and pedophilic sexual proclivities to Plaintiff and his family;

   e.   Providing a reasonably safe environment for Plaintiff;

   f.   Preventing the sexual abuse of its parishioners and children; and

   g.   Ensuring that when other priests, agents, and/or employees learned of the sexual proclivities of its priests to immediately take the necessary steps to cause the illegal conduct to stop.

159.    As a result of the failure to follow the above-cited contractual requirements, Defendants breached the contract formed with Plaintiff's family, in part for the benefit of Plaintiff.

160.    As a direct and proximate result of Defendants' breach of the contract, Plaintiff experienced the sexual abuse at the hands of Rev. Bossa, as well as the ensuing physical, mental, and financial injuries and damages discussed herein, which Plaintiff continues to suffer.

161.    As a direct and proximate result of Defendants' breach of their contractual duties, Plaintiff suffered economic losses, including loss of the value of Plaintiff's services, and other compensable losses based on the benefit of the bargain, including loss of faith.

### FIFTH CAUSE OF ACTION
#### (As to Defendant Holy See)
**(Violation of Customary International Law of Human Rights)**

162.    Plaintiff incorporates all consistent paragraphs of this Complaint as if fully set forth under this count.

163.    Defendant Holy See directly, and by and through its agents and employees, had a duty to follow and uphold the international law of human rights, as has been codified in various international agreements, with respect to Plaintiff and Rev. Bossa.

164.    Defendant Holy See's agents and employees responsible for supervising priests, including Rev. Bossa, violated the *Universal Declaration of Human Rights,* in that, as a matter of public policy, they ignored, tolerated, disregarded, permitted, allowed, condoned, and/or failed to report child sexual abuse, which the international community and civilized world views as cruel, inhumane and degrading.

165.    Defendant Holy See's agents and employees responsible for supervising priests, including Rev. Bossa, violated the *Convention on the Rights of the Child,* in that, as a matter of public policy,  they, among other things, did not make the interests of minor children in its control their primary responsibility; did not conform to international standard for the safety and health of those children, including Plaintiff, in considering the suitability of their priests, clergy members, agents and servants; did not take all appropriate legislative, administrative, social and educational measures to protect Plaintiff from sexual abuse; did not prevent, identify, report, investigate, treat or follow-up on instances of child sexual abuse of which it had knowledge; and did not undertake

to protect Plaintiff from sexual exploitation and abuse.

166.    The practices, instructions, and mandates of Defendant Holy See in the United States, as carried out through its agents and employees, prohibiting the disclosure of the identity and existence of pedophiles and sexual predators under its control and hereby placing children in positions of harm, whether undertaken under the color of law or only in its capacity as a private actor, are violations of customary international law, and are crimes to which the law of nations attributes individual responsibility.

167.    Defendant Holy See is vicariously liable for the conduct of its agents and employees, as described above, and the foreseeable harm to Plaintiff, through the doctrine of *respondeat superior*.

168.    As a direct and proximate result of such violations, Plaintiff suffered the injuries and damages described herein.

      a.  Past, present and future conscious pain and suffering;

      b.  Past, present and future mental anguish and emotional distress;

      c.  Past, present and future medical expenses;

      d.  Past, present and future lost wages, loss of earnings and earning capacity;

      e.  Compensatory damages;

      f.  Punitive damages;

      g.  Exemplary damages;

      h.  Litigation costs, expenses and reasonable and necessary attorneys' fees;

      i.  Pre-judgment and post-judgment interest pursuant to 28 U.S.C. § 1961 and any other applicable law or statute; and

      j.  Any and all other damages to which Plaintiff may be justly entitled.

## PRAYER FOR RELIEF

**WHEREFORE**, based on the foregoing causes of action, Plaintiff demands judgment against Defendants Our Lady of Mt. Carmel Parish, Church of Our Lady of Mt. Carmel, Our Lady of Mt. Carmel Development Corporation, the Roman Catholic Archdiocese of New York, Archbishop of New York, The Society of the Catholic Apostolate aka Pallottines, and the Holy See, on their designated causes of action, in an amount to be determined in a trial by jury; for a sum that will fully and fairly compensate Plaintiff for alleged injuries and conscious pain and suffering, that Plaintiff recovers actual damages; that Plaintiff is entitled to recover compensatory damages; that Plaintiff recovers punitive damages; together with litigation costs, expenses and reasonable and necessary attorneys' fees, pre-judgment and post-judgment interest pursuant to 28 U.S.C. § 1961 and any other applicable law or statute; and any and all other relief to which Plaintiff may be justly entitled.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

**D'ARCY JOHNSON DAY**

Dated: New York, New York       By:  **/s/ Peter W. Smith**
March 9, 2020                         Peter W. Smith, Esq.
                                      1501 Broadway, 12th Floor
                                      New York, New York 10036
                                      (866) 327-2952
                                      PWS@DJD.LAW

**MATTHEWS & ASSOCIATES**

                                 By:  /s/ David P. Matthews
                                      David P. Matthews, Esq.
                                      dmatthews@thematthewslawfirm.com
                                      Timothy A. Bearb, Esq.*
                                      tbearb@thematthewslawfirm.com
                                      Liza K. Roys, Esq.*
                                      lroys@thematthewslawfirm.com

2905 Sackett St.
Houston, Texas 77098
(713) 522-5250

**FREESE & GOSS**

By:  /s/ Tim K. Goss
Tim K. Goss, Esq.
tim@freeseandgoss.com
3500 Maple Ave., Suite 1100
Dallas, TX 75219
214.761.6610
***Attorneys for Plaintiff,***
***Thomas Alberto Robles***

***\*Attorneys will be seeking pro hac vice admission***