UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
------------------------------------------------------- X
```
THOMAS ALBERTO ROBLES,                                  :

                                       Plaintiff,       :
                                                        :
                                                        :
              -against-                                 :
                                                        :
                                                        :
HOLY SEE (STATE OF VATICAN CITY;                        :
THE VATICAN); OUR LADY OF MOUNT                         :
CARMEL PARISH; CHURCH OF OUR LADY                       :
OF MT. CARMEL; OUR LADY OF MT.                          :
CARMEL DEVELOPMENT CORPORATION;                         :
ARCHDIOCESE OF NEW YORK a/k/a                           :
ROMAN CATHOLIC ARCHDIOCESE OF                           :
NEW YORK; ARCHBISHOP OF NEW YORK;                       :
and THE SOCIETY OF THE CATHOLIC                         :
APOSTOLATE a/k/a PALLOTTINES;                           :
                                                        :
                                       Defendants.      :
```
------------------------------------------------------- X
```

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:___12/20/21___

20-CV-2106 (VEC)

MEMORANDUM
OPINION & ORDER

VALERIE CAPRONI, United States District Judge:

In 1974, Barry F. Bossa pled guilty to misdemeanor sexual abuse for performing oral sex

on a twelve-year-old boy.  Seven years later, in 1981, he was ordained as a Catholic priest.

Bossa then became a parish priest at Mt. Carmel Church in New York City, where Thomas

Alberto Robles, the plaintiff in this case and a minor at the time, was a parishioner.  According to

Mr. Robles, between 1981 and 1986, Bossa repeatedly sexually abused him.  Mr. Robles has

brought this suit against several defendants, including various non-profit ecclesiastical

organizations in New York (the "New York Defendants"), the Archbishop of New York, and the

Holy See, otherwise known as the Vatican.  The Holy See has moved to dismiss for lack of

subject-matter jurisdiction, lack of standing, and failure to state a claim upon which relief can be

granted.  For the reasons that follow, the Holy See's motion to dismiss is GRANTED without

prejudice to Plaintiff seeking leave to amend as to his vicarious liability negligence claim and with prejudice as to all other claims.

## BACKGROUND

Mr. Robles, a New York resident, filed this suit on March 19, 2020, alleging that Bossa sexually abused him between January 1, 1981 and December 31, 1986.  Compl., Dkt. 3 ¶¶ 1, 4, 7.  At the time of the alleged abuse, Mr. Robles was a minor attending Mt. Carmel Church, where Bossa was a priest.  *Id.* ¶¶ 7–8.  The Holy See is a foreign state,[1] and it is the ecclesiastical, governmental, and administrative capital of the Roman Catholic Church, located in the Vatican City State, Italy.  *Id.* ¶ 17.  Plaintiff maintains that all Defendants had various employment and supervisory responsibilities over Bossa during the time of the alleged abuse.  *Id.* ¶¶ 2–4, 38, 41, 77–79.  With respect to the Holy See, Plaintiff alleges that the sovereign's policies regarding handling sexual abuse allegations against members of the clergy — primarily the 1962 *Crimen sollicitationis* (the "1962 Policy") and the 1917 Canon of Law (the "Canon") — contributed to his abuse.  *Id.* ¶¶ 69–74; *see* Haller Decl., Dkt. 78-5, Ex. E (1962 Policy).[2] According to Plaintiff, when they applied, those policies required complete secrecy regarding certain allegations of sexual misconduct and forbade clergy members from revealing, reporting,

---

[1]    The Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. §§ 1330 *et seq.*, does not define the term "foreign state."  Although the Second Circuit has not decided whether the Holy See is a foreign state as that term is used in the FSIA, other circuits have concluded that it is.  *See, e.g.*, *O'Bryan v. Holy See*, 556 F.3d 361, 372–74 (6th Cir. 2009) (holding the Holy See is a "foreign state" within the FSIA); *Ams. United for Separation of Church & State v. Reagan*, 786 F.2d 194, 197 (3d Cir. 1986) (noting that diplomatic relations between the Holy See and United States began in 1984).  Plaintiff agrees that the Holy See is a "foreign state" within the meaning of the FSIA.  Compl. ¶ 46 ("the Holy See is a foreign state defendant subject to the" FSIA).

[2]    The Complaint effectively incorporates the 1962 Policy by reference.  *See, e.g.*, Compl. ¶¶ 64, 64 n.9, 71, 71 n.10.  The Court therefore relies on the translated version of the 1962 Policy linked in the Complaint and in Defendant's declaration in support of its motion.  *Id.* ¶ 64 n.9; *see generally* Ex. E; *Bank of New York Mellon Trust Co. v. Morgan Stanley Mortg. Capital, Inc.*, No. 11-CV-0505, 2011 WL 2610661, at *3 (S.D.N.Y. June 27, 2011) ("In deciding a motion to dismiss, this Court may consider the full text of documents that are quoted in or attached to the complaint, or documents that the plaintiff either possessed or knew about and relied upon in bringing the suit.") (citation omitted)).  *See also infra* n.3 (taking judicial notice of English translation of the 1962 Policy).

or warning of sexual abuse committed by other clergy to anyone outside the Church or to most within the Church, other than through a mandatory reporting process discussed below.  Compl. ¶¶ 69–74.  On the basis of these policies and the Holy See's status as an employer, Mr. Robles asserts five claims against the Holy See: (1) negligence, both direct and via vicarious liability; (2) negligent training, supervision, and retention, both direct and via vicarious liability; (3) gross negligence; (4) breach of contract; and (5) violation of Customary International Law, both direct and via vicarious liability.  *Id.* ¶¶ 102–68.

After Plaintiff served the Holy See on January 5, 2021, *see* Dkt. 66, the Holy See moved to dismiss pursuant to Federal Rules of Civil Procedure 12(b)(1), 12(b)(2), and 12(b)(6) on the grounds that: this Court lacks jurisdiction over it under the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. §§ 1330 *et seq.*; Plaintiff lacks standing; and Plaintiff failed to state a claim. *See* Not. of Mot., Dkt. 74; *see* Def. Mem., Dkt. 75 at 1–2, 27, 29.[3]  As the following analysis shows, all of Plaintiff's claims fail, although they do so at different stages of the FSIA analysis.

## DISCUSSION

### I.    Legal Standard

In its motion to dismiss, the Holy See raises a facial attack against the Complaint under Federal Rules of Civil Procedure 12(b)(1), 12(b)(2), and 12(b)(6).  Def. Mem. at 1.  To survive the Holy See's motion to dismiss, Mr. Robles' "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556

---

[3]        The Holy See also submitted two requests for judicial notice in support of its motion.  *See* Not. of Request 1, Dkt. 77; Not. of Request 2, Dkt. 88.  The first regards the public corporate records of the Society of the Catholic Apostolate (the "Pallottines"); Mt. Carmel Church; and the Archdiocese of New York, as well as the translation of the 1962 Policy from the Holy See's official website.  Not. of Request 1 at 2–5.  The second regards the public corporate records of the United States Conference of Catholic Bishops; the Society for the Propagation of the Faith of the Archdiocese of New York; and the Archdiocese of Milwaukee.  Not. of Request 2 at 2–3.  Neither request is opposed by Plaintiff, so the Court judicially notices the exhibits.

U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  In

general, "a complaint does not need to contain detailed or elaborate factual allegations, but only

allegations sufficient to raise an entitlement to relief above the speculative level."  *Keiler v.

Harlequin Enters. Ltd.*, 751 F.3d 64, 70 (2d Cir. 2014) (citation omitted).  The Court accepts all

factual allegations in the complaint as true and draws all reasonable inferences in the light most

favorable to the plaintiff.  *See Gibbons v. Malone*, 703 F.3d 595, 599 (2d Cir. 2013).  Although

the Court accepts factual allegations as true, "[t]hreadbare recitals of the elements of a cause of

action, supported by mere conclusory statements, do not suffice."  *Iqbal*, 556 U.S. at 678 (citing

*Twombly*, 550 U.S. at 555).

## II.    The Court Does Not Have Jurisdiction Over the Holy See Based on the Current Complaint

There is a presumption in the FSIA that foreign states are immune from the jurisdiction

of courts in the United States.  28 U.S.C. § 1330(a)–(b) (creating jurisdiction for claims "with

respect to which the foreign state is not entitled to immunity"); *Schoeps v. Bayern*, 27 F. Supp.

3d 540, 542 (S.D.N.Y. 2014) (noting the FSIA "provides the sole basis for obtaining jurisdiction

over a foreign state in the courts of this country") (quoting *Argentine Republic v. Amerada Hess

Shipping Corp.*, 488 U.S. 428, 434 (1989)).  A foreign state is only subject to the jurisdiction of a

U.S. court if one of the FSIA's enumerated exceptions applies.  28 U.S.C. § 1604; *Atlantica

Holdings, Inc. v. Sovereign Wealth Fund Samruk-Kazyna JSC*, 813 F.3d 98, 106 (2d Cir. 2016);

*see also* 28 U.S.C. § 1330(a) (providing original jurisdiction).  Here, Plaintiff argues that two

exceptions apply: the Commercial Activity Exception, 28 U.S.C. § 1605(a)(2), and the Tortious

Act Exception, 28 U.S.C. § 1605(a)(5).  The Court finds that the latter exception applies, but

that, insofar as it applies, the Discretionary Function Exclusion from the Exception, discussed

*infra* at 23–28, also applies, leaving the Court without jurisdiction over the Holy See.

### A. The Commercial Activity Exception Does Not Provide a Basis for Jurisdiction Over the Holy See

The Commercial Activity Exception to the FSIA provides jurisdiction when the action is based upon (1) "a commercial activity carried on in the United States by the foreign state"; (2) "an act performed in the United States in connection with a commercial activity of the foreign state elsewhere"; or (3) "an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States."  28 U.S.C. § 1605(a)(2).  Whether an action is commercial in character is "determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose."  28 U.S.C. § 1603(d).  A sovereign engages in commercial activity when it acts "not as [a] regulator of a market, but in the manner of a private player within it." *Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607, 614 (1992).

The U.S. Supreme Court has held that courts should look to the "gravamen of the complaint" when determining whether a claim against a foreign state is commercial. *Saudi Arabia v. Nelson*, 507 U.S. 349, 357 (1993) (citation omitted).  The Court does not need to determine whether the Holy See was otherwise engaged in commercial activity within the meaning of the statute because Plaintiff's claims are clearly not commercial.

The gravamen of Plaintiff's complaint is a personal injury claim based on alleged sexual abuse.  In *Nelson*, an American employee of a Saudi hospital sued the Kingdom of Saudi Arabia for injuries from his alleged detention and torture by the Saudi Government.  507 U.S. at 352–55. The Supreme Court determined that, although the commercial activities of being recruited and employed by Saudi Arabia led to the employee's alleged injury, the gravamen of the employee's claim was tortious and not commercial.  *Id.* at 358.  While Plaintiff argues that the Holy See is a commercial actor and provides many examples of activities engaged in by the Holy See that are

purportedly commercial, *see* Pl. Opp., Dkt. 86 at 5–6, Plaintiff does not plausibly argue that the

essence of his complaint is commercial.   *See Doe v. Holy See*, 434 F. Supp. 2d 925, 942 (D. Or.

2006) (holding a complaint alleging sexual abuse did not fall within the Commercial Activity

Exception) (citing *Nelson*, 507 U.S. at 363), *rev'd on other grounds*, 557 F.3d 1066 (9th Cir.

2009); Def. Reply, Dkt. 87 at 4.[4]  The employment of Bossa may have been commercial in some

sense of the term, but Bossa's alleged tortious behavior was not.   To the extent that other

plaintiffs have attempted to rely on the Commercial Activity Exception as a basis for jurisdiction

over the Holy See for clergy sexual abuse claims, courts have consistently held that such claims

are tortious in nature and therefore do not fall within the Commercial Activity Exception.

*O'Bryan v. Holy See*, 556 F.3d 361, 380 (6th Cir. 2009); *Doe*, 434 F. Supp. 2d at 942; *see also*

*O'Bryan v. Holy See*, 471 F. Supp. 2d 784, 788 (W.D. Ky. 2007).

Apparently hoping that this Court would somehow be persuaded to sidestep precedent

relative to the inapplicability of the Commercial Activity Exception to clergy sexual abuse

claims brought against the Holy See, Plaintiff has included a claim for breach of implied contract

in his Complaint.  Compl. ¶¶ 154–61.  Plaintiff alleges that an implied contract was formed when

he was placed in the care of the Church; the terms of the implied contract were that the various

Defendants, including the Holy See, would protect Plaintiff from abuse in exchange for his

parent's financial contributions and his labor as an altar boy.  *Id.* ¶¶ 155, 157–58.  While a clever

twist, those allegations do not change the essence of his claim, which is not commercial within

the meaning of the FSIA.  For his breach of implied contract claim, Plaintiff "does not allege

---

[4]      Additionally, although the Court need not reach this issue given the gravamen of the complaint analysis,
Plaintiff asserts, relying on *Weltover*, 504 U.S. at 614–15, that the primary question is "whether the foreign state is
acting with a profit motive or instead with the aim of fulfilling uniquely sovereign objectives." Pl. Opp. at 4.  But
*Weltover* stands for the opposite proposition: that the "question is *not* whether the foreign government is acting with
a profit motive," but rather "whether the government's particular actions" are commercial in nature, regardless of
motive.  *Weltover*, 504 U.S. at 614 (emphasis added).

property damage, breach of contract for goods or services, product liability, copyright infringement, an indebtedness yet unpaid on a loan or other transaction, or any other theory whose true essence is commercial." *Doe*, 434 F. Supp. 2d at 942.

Because the gravamen of the complaint sounds in tort, the Court need not reach the question of whether the requirements of 28 U.S.C. § 1605(a)(2) have been met. The Court plainly does not have jurisdiction over the Holy See under this exception. Further, because Plaintiff's claim for breach of implied contract is both not commercial and does not sound in tort, which provides the only other basis for subject-matter jurisdiction under the FSIA, there is no basis for the Court to exercise jurisdiction over the implied contract claim. Accordingly, the implied contract claim is dismissed with prejudice as against the Holy See.[5]

### B. But for the Discretionary Function Exclusion, the Court Might Have Jurisdiction Over Some Vicarious Liability Claims Against the Holy See Under the Tortious Act Exception

The Tortious Act Exception applies to claims "in which money damages are sought against a foreign state for personal injury or death," for "the tortious act or omission of . . . any official or employee of that foreign state while acting within the scope of his office or employment," if the act or omission and injury occurred in the United States. 28 U.S.C. § 1605(a)(5). There is, however, an exclusion to the Tortious Act Exception when the tortious act

---

[5]     Defendant also argues that Plaintiff fails to state claim for breach of implied contract against the Holy See because there was no "meeting of the minds that is sufficient to constitute an enforceable contract." Def. Mem. at 32 (citing *Coca-Cola Refreshments, USA, Inc. v. Binghamton Giant Markets, Inc.*, 127 A.D.3d 1319, 1320 (3d Dep't 2015)). Because Plaintiff has only pled direct liability against the Holy See for a breach of implied contract, and not vicarious liability, *see* Compl. ¶¶ 154–61, Plaintiff cannot show that the Holy See itself and Plaintiff "engaged in a pattern of consistent interaction that established terms of an implied-in-fact contract." *Soley v. Wasserman*, 823 F. Supp. 2d 221, 231 (S.D.N.Y. 2011). While an individual or corporation may have breached an implied contract to care for Plaintiff, Plaintiff does not plead the requisite facts for this claim against the Holy See. Therefore, if there were jurisdiction, the Court would dismiss Plaintiff's breach of implied contract claim for failure to state a claim upon which relief can be granted.

either (1) arose out of misrepresentation or deceit or (2) involved the exercise or performance of a discretionary function. *Id*. at 1605(a)(5)(A)–(B).

The Holy See argues that the Tortious Act Exception cannot apply based on alleged tortious conduct by the Society of the Catholic Apostolate (the "Pallottines"), Mt. Carmel Church, or the Archdiocese of New York because they are separate corporations, and it cannot apply to alleged tortious conduct by "agents" of the Holy See because the language of the exception refers only to "officials" and "employees," not to "agents". Def. Mem. at 10–13. The Holy See also argues that, to the extent the actions of an employee can be attributed to an employer: (i) Plaintiff alleges a "layered employee" theory, which is not sufficient to confer jurisdiction; (ii) Plaintiff fails to allege that any Holy See employee (as properly defined) engaged in tortious conduct in the United States; and (iii) under New York law, Bossa's alleged abuse cannot be imputed to the Holy See under a theory of *respondeat superior*. *Id.* at 13–20. The Holy See further argues that its own allegedly tortious conduct cannot confer jurisdiction because such conduct did not occur entirely within the United States. *Id.* at 20–22. Finally, the Holy See argues that even if American clergy can be considered Holy See employees, the misrepresentation and discretionary exclusions to the Tortious Act Exception bar Plaintiff's claims. *Id.* at 22–27.

    1.  **The Court Does Not Have Jurisdiction Over Claims Against the Holy See Based on Tortious Conduct of Other Religious Entities or of Agents of the Holy See, but It Could Have Jurisdiction Over Claims Based on Tortious Conduct of Employees of the Holy See**

        a.  **Plaintiff Cannot Overcome the Presumption That the Pallottines, Mt. Carmel Church, and the Archdiocese Are Separate Juridical Entities**

Instrumentalities of a foreign state are presumed to have separate juridical statuses. *Doe*, 557 F.3d at 1077 (citing *First Nat. City Bank v. Banco Para El Comercio Exterior de Cuba*

("*Bancec*"), 462 U.S. 611, 624–28 (1983)).  That presumption can be overcome when (1) "a

corporate entity is so extensively controlled by its owner that a relationship of principal and

agent is created," or (2) when recognizing the corporation as separate "would work fraud or

injustice." *Bancec*, 462 U.S. at 629 (citations omitted).  The Holy See argues that claims based

on the alleged tortious conduct of the Pallottines, Mt. Carmel Church, and the Archdiocese, as

separate corporations, do not provide a basis for jurisdiction over the Holy See.[6]  Def. Mem. at

10–12; Def. Reply at 1–3; Haller Decl., Dkts. 78-1, 78-2, 78-4, Exs. A–B, D.  Plaintiff argues

that the presumption is overcome by the fact that the Holy See exercises control over all three

entities, or in the alternative, that refraining from imputing their tortious conduct to the Holy See

would cause injustice.  Pl. Opp. at 21–25.

     The Second Circuit has held that five factors are relevant to the "extensive control"

inquiry:

> whether the sovereign nation: (1) uses the instrumentality's property as its own;
> (2) ignores the instrumentality's separate status or ordinary corporate formalities;
> (3) deprives the instrumentality of the independence from close political control
> that is generally enjoyed by government agencies; (4) requires the instrumentality
> to obtain approvals for ordinary business decisions from a political actor; and (5)
> issues policies or directives that cause the instrumentality to act directly on behalf
> of the sovereign state.

*Kirschenbaum v. Assa Corp.*, 934 F.3d 191, 198 (2d Cir. 2019) (citation omitted).  While those

factors are useful, the "touchstone inquiry for extensive control is whether the sovereign state

exercise[s] significant and repeated control over the instrumentality's day-to-day

operations." *Id.* at 197 (citation omitted).

     In a case similar to this one, the Ninth Circuit held that a complaint against the Holy See

alleging sexual abuse by an American priest failed to allege the level of control necessary to

---

[6]    As noted earlier, the Court has taken judicial notice that all three corporations are separate entities from the
Holy See.  *See supra* n.3.

overcome the *Bancec* presumption.  *Doe*, 557 F.3d at 1079–80.  There, the "complaint [did] not allege day-to-day, routine involvement of the Holy See in the affairs of the" presumed separate entities.  *Id.* at 1079.  Plaintiff argues that, unlike the complaint in *Doe*, his Complaint alleges the requisite level of control in numerous paragraphs.  Pl. Opp. at 23–23.  Some of the paragraphs to which Plaintiff points contain only conclusory statements that the "Holy See had complete, unfettered control and authority" over the New York Defendants, and others include more specific mechanisms by which the Holy See exercised some control over certain aspects of church operations, such as by requiring periodic status reports from dioceses, archdioceses, bishops, archbishops, and cardinals; having the sole authority to remove religious leaders from the clergy; and promulgating rules, regulations, laws, policies, and procedures applicable to all agents and employees of the Church.  *Id.*

Common sense dictates that the Holy See exercises some amount of control over separate Catholic corporations; the issue is whether that control is "extensive."  Exercising control over "day-to-day operations" is a high bar; it was met when the sovereign controlled routine business decisions such as declaring and paying dividends, *see McKesson Corp. v. Islamic Republic of Iran,* 52 F.3d 346, 351–52 (D.C. Cir. 1995), but not when the sovereign owned a majority of stock, appointed the Board of Directors, Chairman of the Board, and President, and oversaw the restructuring of internal operations.  *Transamerica Leasing, Inc. v. La Republica de Venezuela*, 200 F.3d 843, 850–51 (D.C. Cir. 2000).  Plaintiff rightly notes that this is a "fact-specific" inquiry.  Pl. Opp. at 21 (citation omitted).  But Plaintiff fails to explain how the factual allegations in the Complaint satisfy the five factors quoted above from *Kirschenbaum*.  There are, for example, no allegations that the Holy See ignored separate status or ordinary corporate formalities or required the Pallottines, Mt. Carmel Church, or the Archdiocese to obtain

approvals for routine business decisions. *Kirschenbaum*, 934 F.3d at 198. No sovereign-corporation relationship is directly analogous to that of the Holy See and domestic Catholic corporations, and the Holy See's policies instructing corporations how to operate with respect to certain allegations of sexual misconduct suggest a high degree of control over the type of claim alleged in Plaintiff's Complaint. But the kind of control needed to overcome the *Bancec* presumption is broader than control that is limited to the handling of allegations of particular types of tortious conduct: the control must be to the domestic corporation as a whole, not to isolated aspects of the corporation's operations. As in *Doe*, that burden has not been met here.

Plaintiff's argument that recognizing these corporations as separate entities would result in injustice is similarly unavailing. Plaintiff merely regurgitates the *Bancec* standard and leaves the Court to speculate how it might apply to this case. Pl. Opp. at 25. As the Ninth Circuit stated in *Doe*, there is no suggestion here that "the Holy See created the corporations for the purpose of evading liability for its own wrongs" or that "the Holy See has inappropriately used the separate status of the corporations to its own benefit." *Doe*, 557 F. 3d at 1080. Thus, Plaintiff has not overcome the *Bancec* presumption of juridical separateness, and Plaintiff's claims against the Holy See for negligence, negligent training, supervision, and retention, and violations of international law on the basis of *respondeat superior* with respect to the acts and omissions of the Pallottines, Mt. Carmel Church, and the Archdiocese are dismissed with prejudice.

### b.  The Tortious Act Exception Does Not Reach Agents of the Holy See

The actions of agents of the Holy See present a different set of considerations but lead to the same conclusion. Plaintiff alleges that the Holy See can be held liable for negligence, negligent training, supervision, and retention, and international law violations based on the acts

and omissions of agents, employees, and the Archbishop of New York.  Compl. ¶¶ 126, 139,

163–65.  The Tortious Act Exception, as Defendant notes, extends to tortious conduct by the

"foreign state" or its "official or employee."  Def. Mem. at 12 (citing 28 U.S.C. § 1605(a)(5)).

Because the FSIA includes the actions of "an agent" of a foreign state as the basis for jurisdiction

over the foreign state, the Court must presume that Congress intentionally omitted "agent" from

the section of the statute that establishes the Tortious Act Exception.  *Russello v. United States*,

464 U.S. 16, 23 (1983).  Plaintiff does not disagree with this construction of the exception, Pl.

Opp. at 15, and the Court sees no reason to deviate from the plain text of the statute.  Therefore,

Plaintiff's claims against the Holy See for negligence, negligent training, supervision, and

retention, and violations of international law on the basis of *respondeat superior* predicated on

the acts or omissions of "agents" of the Holy See are dismissed with prejudice.

### c. The Doctrine of Limited Liability Does Not Categorically Preclude Bossa, the Archbishop of New York, and Other Clergy from Being Employees of the Holy See

The complex relationship between the central authority of the Roman Catholic Church

and local church officials defies easy comparison to conventional conceptions of an employer-

employee relationship.  The Holy See makes much of the fact that Plaintiff alleges Bossa was

employed at various times by each of the New York Defendants, the Archbishop, and the Holy

See and urges the Court to reject Plaintiff's notion that personnel could have been employed both

by their local entities and by the Holy See, either at the same time or at different times.  Def.

Mem. at 14.  Unlike Defendant, the Court does not find Plaintiff's theory "fatuous."  *Id.*[7]

---

[7]     In its argument, the Holy See at times obscures the distinction between the concept of "layered" employment, *i.e.*, the Holy See employing individuals via subsidiaries, and joint employment, in which individuals are direct employees of both the local ecclesiastical organization and the Holy See (which could also reflect the status of clergy during periods when they are not affiliated with a specific local ecclesiastical organization and are awaiting a new placement).  Def. Mem. at 13–16.

The crux of the Holy See's argument is that treating Bossa, the Archbishop, and other clergy as employees of the Holy See violates the doctrine of limited liability. *Id.* (citing *Murray v. Miner*, 74 F.3d 402, 404 (2d Cir. 1996)). On this basis, Defendant argues that an individual cannot be employed by a parent company and its subsidiary at the same time. *Id.* at 14–16. This argument intersects with how the FSIA defines "employee" under the Tortious Activity Exception. While the Court's *Bancec* analysis leads to the determination that the New York Defendants are separate entities from the Holy See, whether a member of the American clergy is also an employee of the Holy See is a distinct question. Here, Plaintiff's theory is not that Bossa, the Archbishop, and other clergy were employed by a subsidiary and, therefore, if one pierces the corporate veil the Holy See may also be liable for those employees' actions, but rather that the Holy See itself employed them under the New York state law definition of an employee. *See Doe*, 557 F. 3d at 1081–82; *O'Bryan*, 556 F. 3d at 382–83.[8] Under the FSIA, the definition of an employee is governed by state law. As a result, if, under New York State law, those individuals were "employees" of the Holy See, then the Holy See can be liable for their actions. In that situation, it does not require piercing the corporate veil for the Holy See to be responsible for acts of American clergy.[9] *Doe v. Holy See*, No. 02-CV-430, 2011 WL 1541275, at *4 (D. Or. Apr. 21, 2011).

In two similar cases, the Ninth and Sixth Circuits held that the plaintiffs had alleged facts sufficient to survive a motion to dismiss to demonstrate that a priest employed by a local church was also an employee of the Holy See; in one of those cases the court so held in the face of a

---

[8]     For more on this, *see infra* Section II(B)(2).

[9]     The Holy See argues federal common law governs this question. Def. Mem. at 16–17. The Court disagrees as discussed, *infra,* in Section II(B)(2).

finding that the domestic corporations in question maintained separate juridical statuses.  *See Doe*, 557 F. 3d at 1080–82; *O'Bryan*, 556 F. 3d at 382–83.  In *Doe*, while the Ninth Circuit determined that the *Bancec* presumption of separate juridical status applied to the domestic Roman Catholic corporations, it did not consider whether the doctrine of limited liability affected its application of *respondeat superior* to the Holy See on the basis of local priests' employment status.  *Doe*, 557 F.3d at 1079–82; *see also Doe*, 2011 WL 1541275, at *4 (applying Oregon law to determine whether a priest was an "employee" of the Holy See).  In *O'Bryan*, a class action against the Holy See for sexual abuse by Roman Catholic clergy in the United States, the Sixth Circuit applied Kentucky law, which defines an employee as "an agent whose principal controls or has the right to control the manner and means of the agent's performance of work," to determine that the offending priests were employees of the Holy See.  556 F. 3d at 382–83.

Defendant argues that *O'Bryan* should be distinguished because it did not involve a multiple employment allegation, but the fact that the plaintiffs in *O'Bryan* only sued the Holy See does not mean that the alleged offenders were only employed by the Holy See.  To the contrary, there is no question that they were priests in Kentucky churches.  *Id.* at 369.  It is true that "the law only treats the employees of a corporate entity as the employees of a related entity under extraordinary circumstances."  *Murray*, 74 F.3d at 404.  But the Complaint alleges that these individuals were direct employees of the Holy See, not employees of the Holy See by way of subsidiary entities.  *See, e.g.*, Compl. ¶¶ 2, 4, 21, 41.  Contrary to Defendant's assertion, the Complaint has not done so solely in a conclusory manner.  Def. Mem. at 14–15.[10]

---

[10]     *See infra* II(B)(2)(a).  Defendant argues that Plaintiff makes only conclusory allegations of employment that cannot survive a facial challenge post-*Iqbal*.  Def. Mem. at 14 n.9.  In support, Defendant cites *Doe I v. Wal-Mart Stores, Inc.*, 572 F.3d 677 (9th Cir. 2009).  *Id.*  In that case, the court dismissed Plaintiffs' allegations that Wal-Mart was their employer because plaintiffs made only a "general statement that Wal-Mart exercised control over their day-to-day employment."  *Doe I*, 572 F.3d at 683.  The Ninth Circuit characterized that allegation as a "conclusion, not a factual allegation stated with any specificity."  *Id.*  That is not analogous to the facts alleged in the Complaint in this case.

At this stage, although a close call, Plaintiff has met his burden of alleging facts from which the Court can infer that Bossa,[11] the Archbishop, and other American clergy had an employee-employer relationship with the Holy See, even if further discovery may reveal that inference is not warranted.  At least at this stage, then, the exception to the FSIA for tort liability based on the actions of an employee provides jurisdiction for claims of negligence, negligent training, supervision, and retention, and international law claims against the Holy See.

> **2.  Plaintiff Sufficiently Alleges Tortious Conduct Within the Tortious Act Exception With Respect to the Archbishop and Supervising Clergy Who Purportedly Were Employees of the Holy See, but Not With Respect to Bossa's Conduct**

To be actionable under the Tortious Act Exception, the tort that caused Plaintiff's injuries must have (1) occurred in the United States; (2) been committed by a foreign state or by an official or employee of that foreign state; and (3) been within the scope of the tortfeasor's employment.  28 U.S.C. § 1605(a)(5).  Plaintiff has sufficiently pled facts to confer jurisdiction over the claims arising from acts and omissions of the Archbishop and other supervising clergy, but not over claims arising from the acts and omissions of Bossa.  The Holy See does not contest that the allegations premised on vicarious liability arise from conduct that occurred in the United States, but argues that (1) federal common law and New York law preclude treating American clergy as its employees, and (2) Bossa's alleged tortious conduct was not "within the scope" of his employment under New York law.  Def. Mem. at 16–20.

---

[11]    As the Court discusses below, the Holy See cannot be held vicariously liable for Bossa's behavior under New York law for other reasons, but the claim does not fail at this stage of the Court's analysis.  *See infra* II(B)(2)(b).

### a.  Plaintiff Has Adequately Alleged That American Clergy Are Employees of the Holy See

Defendant argues that federal common law should apply to the definition of employment as used in the Tortious Act Exception.  *Id.* at 16–17.  The Supreme Court has held that "where a state law provides a rule of liability governing private individuals, the FSIA requires the application of that rule to foreign states in like circumstances."  *Bancec*, 462 U.S. at 622 n.11; *see also Randolph v. Budget Rent-A-Car*, 97 F.3d 319, 325 (9th Cir. 1996) (defining "employee" under state law in FSIA tortious act case).  The Second Circuit, which has not reached this exact question, treats the FSIA "as a pass-through to state law principles."  *Pescatore v. Pan Am. World Airways, Inc.*, 97 F.3d 1, 12 (2d Cir. 1996) (cleaned up).  As noted above, in *O'Bryan*, the Sixth Circuit applied Kentucky law to the question of employment status.  556 F. 3d at 382–83.  While the Ninth Circuit did not reach this issue in *Doe*, on remand the district court applied Oregon law to the same question.  *Doe*, 557 F. 3d at 1081–82; *Doe*, 2011 WL 1541275, at *4.  In contrast, Defendant argues that, because the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346 *et seq*., provides the foundation for the FSIA, and because under the FTCA courts apply federal common law to determine who is an "employee" and apply state law to determine whether alleged tortious conduct is within the "scope of employment," the court should do the same here.  Def. Mem. at 16–17.  But in *Bancec*, the Court declined to treat the FTCA as dispositive as to the interpretation of the FSIA, even though the two statutes contain some identical language, because the FSIA treats foreign states "in the same manner . . . as a private individual" with respect to liability.  462 U.S. at 622 n.11.[12]  The Court finds that state law

---

[12]    The Second Circuit has, in other FSIA cases, deviated from the interpretation of identical terms in FTCA based on the "rule of liability" language that appears in the FSIA.  *See, e.g.*, *Barkanic v. Gen. Admin. of Civ. Aviation of the People's Republic of China*, 923 F.2d 957, 959–61 (2d Cir. 1991) (citing *Bancec*, 462 U.S. at 622 n.11) (applying New York choice-of-law rules based on this language).

applies to the question of who is an employee, but regardless of whether federal common law or

New York law applies, the analysis of who is an "employee" favors Plaintiff at this stage of the

litigation.  For the sake of thoroughness, the Court will evaluate the question under both state and

federal law.

> ### i.        Plaintiff Has Sufficiently Pled That American Clergy Are Employees of the Holy See Under Federal Common Law

Under federal common law, an "employee" is defined by "the conventional master-

servant relationship as understood by the common-law agency doctrine."  *O'Connor v. Davis*,

126 F.3d 112, 115 (2d Cir. 1997) (citations omitted).  "[T]he hiring party's right to control the

manner and means by which the product is accomplished," among other factors, is relevant to

this test.  *Id.* (citation omitted).  Defendant contends that there are two prerequisites for

employment under this analysis: hiring and remuneration.  Def. Mem. at 18.  But which entity

hired the person does not necessarily determine employee status: in fact, the federal common law

agency principle is not very different from Kentucky law of agency, discussed *supra* in Section

II(B)(1)(c).  Applying Kentucky's law of agency, the Sixth Circuit deemed priests to be

employees of the Holy See.  *O'Bryan*, 556 F.3d at 382–83.[13]  Further, the case-law on which

Defendant relies regarding remuneration is distinguishable, as it mainly serves to differentiate

between volunteers and employees.  *O'Connor*, 126 F.3d at 115–16.

Focusing instead on the conventional master-servant relationship, Plaintiff has alleged

numerous mechanisms through which the Holy See exerts control over American clergy.

Plaintiff alleges that the Holy See controls varying levels of clergy in the following ways: by

---

[13]        Clergy may be hired differently depending on the position.  The Archbishop of New York, for example, is appointed by the Pope, while local priests are at least initially hired by local chapters (for instance, Plaintiff alleges Bossa was ordained by, and therefore presumably hired by, the Pallottines).  Compl. ¶¶ 33, 82–83.  Under Defendant's interpretation of federal common law, the Archbishop is almost certainly an employee of the Holy See.

requiring archbishops, bishops, and cardinals to seek explicit permission from the Holy See to spend money in excess of certain limits; by promulgating "rules, regulations, laws, opinions and edicts that it commands be followed by its archbishops, bishops, cardinals. . . and priests in the United States"; by requiring "employees in charge of operations . . . to come to Rome and report about the state of operations" every five years; by requiring bishops, archbishops, and cardinals "to write" and submit "detailed reports" every five years; by commanding that its employees commit to certain policies, such as requiring bishops, archbishops, and priests to be celibate; by having final say over whether a priest may be deprived of his pension or clerical status; by having "final and sole power to remove individual clergy" and to determine whether discipline or removal is appropriate; by promulgating canonical laws regarding training and standards of conduct; and by deciding whether to fire or laicize a priest, bishop, archbishop, cardinal, or religious leader.  Compl. ¶¶ 18, 23, 26–27, 32–35, 37, 39.

While further fact-finding may demonstrate that the Holy See did not at the relevant time exert sufficient control for American clergy to be "employees" of the Holy See as a matter of federal common law, at the motion to dismiss stage, Plaintiff has adequately alleged an employment relationship.  Employment status constitutes a legal conclusion, *see Doe*, 557 F.3d at 1081, and at this stage Plaintiff has alleged sufficient facts to allow discovery on this issue.

### ii.      Plaintiff Has Sufficiently Pled That American Clergy Are Employees of the Holy See Under New York Law

In New York, whether an employment relationship exists depends on "the degree of control exercised by the purported employer over the results produced or the means used to achieve the results."  *Bynog v. Cipriani Grp., Inc.*, 1 N.Y.3d 193, 198 (2003) (citation omitted). The analysis is fact-specific and relevant factors can include, but are not limited to, whether the individual (1) works at his own convenience; (2) may engage in other employment; (3) receives

18

fringe benefits; (4) is on the employer's payroll; and (5) is on a fixed work schedule.  *Id.*

(citations omitted); *see also D. S. v. Positive Behav. Support Consulting & Psych. Res., P.C.*, 197

A.D.3d 518, 520–21 (2d Dep't 2021).[14]  As described *supra* Section II(B)(2)(a)(i), Plaintiff has

alleged a laundry-list of means by which the Holy See exerts control over American clergy.

Further, if a question of fact as to employment exists, dismissal at this stage is improper.  *See*,

*e.g.*, *Murphy v. Guilford Mills, Inc.*, No. 02-CV-10105, 2005 WL 957333, at *5 (S.D.N.Y. Apr.

22, 2005) (holding employment status of tortfeasor "is often a question of fact" and, in a

diversity case applying New York law, may only be resolved as matter of law "where the

evidence in the record is undisputed"); *Valdez v. Melba Utica Packing Co.*, 226 A.D.2d 627, 627

(2d Dep't 1996) (holding whether tortfeasor was an employee of third-party for purposes of

*respondeat superior* is a question of fact).  Taken together, while discovery may well reveal that

Defendant is correct that the Holy See does not have an employment relationship with American

clergy, Plaintiff's pleading survives its facial attack.

---

[14]     This test is typically applied when determining whether an individual is an employee or an independent contractor under New York law.  *See, e.g.*, *Bynog*, 1 N.Y.3d at 198.  Federal courts applying *Bynog* have also leaned on the Second Circuit's four-factor test for whether an individual is an employer under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201 *et seq.*, "which considers the employer's power to: (1) hire and fire employees; (2) supervise and control work schedules and conditions of employment; (3) determine the rate and method of payment; and (4) maintain employment records."  *Taylor Link v. Marshall Hotels & Resorts, Inc., et al.*, No. 20-CV-805, 2021 WL 5040237, at *3 (N.D.N.Y. Oct. 29, 2021) (citation omitted).  The issue of whether an employer-employee relationship exists rarely arises outside the context of wage and hour law cases and cases where the issue is whether an individual is an employee or an independent contractor.  It is clear, however, that New York courts use the "degree of control" test generally for this proposition and that it applies to *respondeat superior* liability for tort claims.  *See, e.g.*, *Kearney v. Genesee Valley Grp. Health Ass'n*, 125 Misc. 2d 716, 726 (Sup. Ct. Monroe Cty. 1984), *aff'd sub nom. Kearney v. GVGHA*, 115 A.D.2d 960 (4th Dep't 1985) (holding private attending physicians at a hospital that are not employed by that hospital could nevertheless lead to *respondeat superior* liability under the "degree of control" test, but that the degree of control is an issue of fact); *Miles v. R&M Appliance Sales*, 26 N.Y.2d 451, 453–54 (1970) (holding *respondeat superior* liability can exist if there is a reasonable belief that the services are being rendered by the employer).

**b.  The Tortious Acts Alleged Were Not Within the Scope of Bossa's Employment, but Other Clergy's Allegedly Tortious Acts Were**

The parties agree that state law governs whether the alleged tortious acts were within the scope of the tortfeasor's employment.  Def. Mem. at 19; Pl. Opp. at 16.  Under New York law, "[i]t is well settled . . . that sexual abuse by clergy is not within the scope or furtherance of the employment" of the abusive clergy member.  *Mazzarella v. Syracuse Diocese*, 100 A.D.3d 1384, 1385 (4th Dep't 2012) (citations omitted).  Therefore, any claims arising from Bossa's intentional torts against Mr. Robles must be dismissed as against the Holy See.[15]

Defendant does not argue that the allegedly tortious actions of supervisory clergy or the Archbishop fall outside the scope of their employment.  Def. Mem. at 19–20.  Under New York law, an employee's actions are imputed to his employer if they were "done while the servant was doing his master's work, no matter how irregularly, or with what disregard of instructions." *Swarna v. Al-Awadi*, 622 F.3d 123, 144 (2d Cir. 2010) (quotation marks omitted).  According to the Complaint, the 1962 Policy and the Canon[16] to which bishops, archbishops and priests were

---

[15]    Mystifyingly, to support an argument for *respondeat superior* as to Bossa's allegedly tortious behavior, Plaintiff points to Connecticut law.  Pl. Opp. at 17–18.  Whether this is a last-ditch effort to distract the Court from New York law, or a genuine misunderstanding of which law applies, Connecticut law has absolutely no bearing on this case.  Plaintiff further argues that the "Holy See fails to distinguish the scope of employment requirement under the tortious act exception of the FSIA with general *respondeat superior*," *id.* at 18, but it is actually Plaintiff who fails to do so; it is settled law in New York that sexual abuse is not within the "scope of employment" of a member of the clergy.  *Paul J.H. v. Lum*, 291 A.D. 2d 894, 895 (4th Dep't 2002) (citations omitted); *Mercer v. State*, 125 A.D.2d 376, 377 (2d Dep't 1986) (citation omitted).  "New York courts consistently have held that sexual misconduct and related tortious behavior arise from personal motives and do not further an employer's business, even when committed within the employment context."  *Ross v. Mitsui Fudosan, Inc.,* 2 F. Supp. 2d 522, 531 (S.D.N.Y. 1998) (citations omitted).

[16]    The 1962 Policy is the primary basis for Plaintiff's allegations against the Holy See.  That policy codified procedures for responding to allegations of priests making sexual advances towards penitents, but it also covered pedophilic behavior by clergy.  Ex. E ¶¶ 1, 71–74.  The 1962 Policy outlined each phase of investigations into allegations of solicitation and mandated absolute secrecy throughout the process.  *Id.* ¶¶ 15–60.  The Canon, a broader document, codified most Holy See policies, regulations, and laws, including the procedures for punishing clergy for child sexual abuse.  Compl. ¶¶ 68–69.  According to Plaintiff, the Canon also mandated absolute secrecy over such allegations.  *Id.*  Because neither party has provided English translations of the relevant portions of the Canon as an exhibit, the Court's analysis focuses primarily on the 1962 Policy and the minor references to the Canon made in Plaintiff's Complaint.

committed mandated secrecy in all matters occurring within the Roman Catholic Church involving accusations of sexual misconduct and related proceedings in ecclesiastical courts. Compl. ¶¶ 69–71.  Employees in New York allegedly carried out those policies by not reporting alleged abuse,[17] by failing to warn their parishioners of Bossa's purportedly known "pedophilic proclivities", mandating secrecy regarding matters of child abuse, and moving Bossa to Vatican City to protect him from prosecution, among other mechanisms.  *Id.* ¶¶ 80, 86, 118.

Therefore, negligence, negligent training, supervision, and retention, and international law claims against the Holy See on the basis of *respondeat superior* for the actions of its hired clergy or personnel survive at this stage of the analysis.

### 3. The FSIA Does Not Confer Jurisdiction Over Any Direct Allegations of Tortious Conduct by the Holy See

As noted above, a threshold inquiry for the Tortious Act Exception is whether the tortious conduct occurred within the United States.  28 U.S.C. § 1605(a)(5).  The Second Circuit requires that the "entire tort" meet the situs requirement.  *In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d 109, 115–16 (2d Cir. 2013).  With respect to all tort claims leveled directly against the Holy See, including Plaintiff's claims for negligence; negligent training, supervision, and retention; gross negligence; and violations of international law, Plaintiff cannot show that the entire tort occurred within the United States.

---

[17]     The Court notes that although the Complaint alleges that Plaintiff was harmed by policies purportedly promulgated by the Holy See not to report suspected child abuse to law enforcement and not to warn parishioners, Compl. ¶ 80, the Complaint never alleges facts from which the Court could reasonably infer that any Defendant knew that Bossa was sexually abusing Plaintiff or any other child as a priest.  Instead, the Complaint includes a number of conclusory allegations that Defendants had "actual or constructive knowledge" that Bossa sexually abused children without any showing that the alleged actual or constructive knowledge pertained to abuse when Bossa was a priest (as opposed to conduct surrounding his 1974 conviction, which predated his ordination).  *Id.* ¶¶ 86, 97–98, 108-09, 117(b)–(c), 118, 133–34, 143, 158(d).

The Holy See's alleged conduct, such as promulgating policies and supervising its employees and officials, occurred in large part at the Vatican. *See*, *e.g.,* Compl. ¶¶ 26–27. As a result, the Holy See is immune from Plaintiff's claims arising from the Holy See's conduct that occurred outside the United States — such as the Holy See's own negligent supervision or its promulgation of the 1962 Policy. *O'Bryan*, 556 F.3d at 385–86. Therefore, Plaintiff's claims against the Holy See for negligence; negligent training, supervision, and retention; gross negligence; and violations of international law are dismissed with prejudice.[18]

### 4. The Misrepresentation Exclusion Does Not Apply to This Case, and the Discretionary Function Exclusion Precludes Jurisdiction Over the Negligence Claims as Pled

#### a. Misrepresentation Exclusion

The Tortious Act Exception excludes claims that arise out of "misrepresentation" or "deceit." 28 U.S.C. § 1605(a)(5)(B). This definition is modeled on the FTCA, and it encompasses claims "arising out of negligent, as well as willful, misrepresentation." *Janowsky v. United States*, 913 F.2d 393, 396 (7th Cir. 1990) (citation omitted); *see also Dorking Genetics v. United States*, 76 F.3d 1261, 1264 (2d Cir. 1996).

Defendant argues that Plaintiff's claims are based on "a misrepresentation theory" because of Plaintiff's reliance on the Holy See's mandated policies of secrecy with respect to pedophilic and sexually abusive priests. Def. Mem. at 23. That the 1962 Policy and the Canon mandated secrecy is a factual element of Plaintiff's claims, but the claims themselves are not misrepresentation claims.

Based on the misrepresentation exclusion, the Second Circuit has dismissed claims against foreign sovereigns when the claims primarily relied on the fact that the foreign sovereign

---

[18]    Plaintiff does not allege a theory of vicarious liability for the claim of gross negligence. *See* Compl. ¶¶ 140–53.

had provided false or misleading information.  *See*, *e.g.*, *Cabiri v. Gov't of Republic of Ghana*, 165 F.3d 193, 199–201 (2d Cir. 1999) (holding intentional infliction of emotional distress claim predicated on the foreign sovereign's misrepresentation regarding the location of plaintiff's missing husband fell within exclusion).  In this case, the mandated policies of secrecy, which allegedly contributed to the continuation of the various torts, do not subsume the alleged tortious actions, which are predicated not only on the fact of mandated secrecy but more broadly on the failure to protect Plaintiff from Bossa's alleged abuse.  *O'Bryan*, 556 F.3d at 388 (holding plaintiffs' claims did not stem directly from misinformation but instead resemble other negligent supervision claims).  For that reason, the misrepresentation exclusion is not relevant to Plaintiff's claims.

### b.  Discretionary Function Exclusion

The Tortious Act Exception also excludes "any claim based upon the exercise or performance or the failure to exercise or perform a discretionary function regardless of whether the discretion be abused." 28 U.S.C. § 1605(a)(5)(A).  It is at this last step of the analysis that the last of Plaintiff's remaining claims against the Holy See — negligence, negligent training, supervision, and retention, and violations of customary international law, all pursuant to *respondeat superior* based on the alleged actions of its putative employees— fail.  Courts model their interpretation of this exclusion on the interpretation of an identical exclusion in the FTCA. *Doe*, 557 F.3d at 1083; *O'Bryan*, 556 F.3d at 383–84.  There is a two-part test: (1) whether the tortious act is discretionary in nature, meaning, it involves "an element of judgment or choice"; and (2) whether the conduct is of the nature that the exclusion was "designed to shield." *United States v. Gaubert*, 499 U.S. 315, 322–23 (1991).  The discretionary function exclusion is intended to insulate from liability sovereign actions and decisions that involve an element of

judgment or choice and that are based on public policy considerations.  *Berkovitz by Berkovitz v. United States*, 486 U.S. 531, 538 (1988).  The exclusion does

> not apply when a [sovereign's] statute, regulation, or policy specifically prescribes a course of action for an employee to follow.  In this event, the employee has no rightful option but to adhere to the directive.  And if the employee's conduct cannot appropriately be the product of judgment or choice, then there is no discretion in the conduct for the discretionary function exception to protect.

*Id.* at 536.[19]  As a result, actions by the Holy See's employees that were entirely controlled by the 1962 Policy cannot be deemed discretionary, but Plaintiff, for all of the many mentions in the Complaint of the 1962 Policy, does not plead a cause of action predicated on actions that were controlled by it.

Plaintiff relies heavily on the Sixth Circuit's decision in *O'Bryan* that any actions flowing from the 1962 Policy cannot "be deemed discretionary."  556 F.3d at 587.  Among the problems with Plaintiff's argument is that the well-pled conduct to which he points was not controlled by the 1962 Policy.[20]

---

[19]     The Holy See argues that the first prong of the *Berkovitz* test requires a showing that the sovereign's employees "*violated* a . . . statute, regulation, or policy that is both specific and mandatory."  Def. Mem. at 24 (citing *Elder v. United States*, 312 F.3d 1172, 1177 (10th Cir. 2002)) (emphasis added).  The *Berkovitz* test, upheld in *Gaubert*, is as follows: if the challenged conduct involves an element of judgment or choice, it is discretionary and therefore excluded; if the challenged conduct follows a statute, regulation, or policy that prescribes a course of action, it is not discretionary and therefore it is not excluded.  486 U.S. at 536.  The Ninth Circuit's reasoning in *Doe* reflects the understanding that complying with a policy is inherently outside the scope of the discretionary exclusion.  There, the complaint was facially deficient because it failed to allege "the terms of [an] alleged policy, or describe any documents, promulgations, or orders embodying it" that were "specific and mandatory."  *Doe*, 557 F.3d at 1084 (citation omitted).  (In that case, the pleadings did not refer to the 1962 Policy or the Canon.)  Although claims brought under the FTCA generally allege noncompliance with a mandatory government policy or law, there is a substantial difference between claims brought under the FTCA and those brought under the FSIA: the FTCA shields the U.S. government from "[a]ny claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid."  28 U.S.C. § 2680(a).  The FSIA does not contain such a provision.  *See* 28 U.S.C. § 1605(a)(5)(A).  Thus, an allegation of compliance with a government regulation would necessarily dispose of an FTCA case; the discretionary exclusion analysis in that context is irrelevant.

[20]     Additionally, the Court notes that the Sixth Circuit engaged in no analysis before deciding that actions that in any way touch on the 1962 Policy are *per se* not discretionary.

Plaintiff alleges that the Holy See mandated policies with respect to elements of training, such as reporting procedures; did the same with respect to the supervision of allegedly abusive priests; and had the ultimate power to expel individual clergy, which implicates the issue of retention.  Compl. ¶¶ 18, 23, 26–27, 32–35, 37, 39.  But alleging that there are policies that touch on training, supervision, and retention does not equate to well-pled allegations that there was *no* residual discretion at the diocese and church level.  Certainly the Complaint has alleged no facts from which this Court can reasonably infer that the Holy See so tightly controlled supervision and training of priests that local supervisors had no discretion in that regard.[21]  One need only observe the significant variability among Catholic parishes, dioceses, and religious orders in the United States and to apply common sense to know that, although all priests must be celibate and must promote the sacred liturgy, *id.* ¶¶ 32–33, there are many ways to minister to parishes and to run a diocese.  And within that mosaic, the individual bishops and cardinals appear to have some discretion in how to deal with priests under their supervision, including, for example, keeping certain priests out of positions that involve contact with children.

In addition to the fact that the Complaint has not adequately alleged that the Holy See's mandated policies left no residual discretion at the church and diocese levels, Plaintiff's attempt to connect the negligence alleged in the Complaint to the 1962 Policy founders upon close inspection.  First, the 1962 Policy appears to apply only to child sex abuse committed by priests, which Bossa was not at the time of his 1974 conviction.  Ex. E ¶ 73 ("Equated with the *crimen pessimum* . . . is any external obscene act, gravely sinful, perpetrated or attempted by a cleric in

---

[21]      The one exception could be as to retention.  Because only the Holy See could decide to defrock a priest, the local churches and dioceses had no discretion in that regard.  But no element of the 1962 Policy mandated when the Holy See could or could not fire a priest, only that it was the only institution with the power to do so, still rendering it a discretionary act on the part of the final arbiter of the retention issue.  Regardless, the 1962 Policy is silent as to whether American clergy had discretion to recommend termination.

any way with pre-adolescent children"); Compl. ¶ 3 (alleging knowledge of Bossa's 1974

conviction).  Therefore, the 1962 Policy posed no barrier to the Defendants exercising discretion

to warn any parish to which Bossa was assigned that he had a prior conviction for inappropriate

sexual contact with a minor.  The 1962 Policy would only come into play if the Defendants

became aware of sexual abuse of children by Bossa as a priest.[22]

For similar reasons, Plaintiff's allegation of violations of Customary International Law

based on vicarious liability, *see* Compl. ¶¶ 162–68, which draw no connection between the

actions of employees of the Holy See and the 1962 Policy, must be dismissed.  Plaintiff alleges

that the Holy See's employees placed children in harm's way, but such employees could have

protected children through alternate means without violating the 1962 Policy, if it applied, and

were free to take whatever steps they deemed appropriate relative to Bossa based on his sexual

misconduct prior to becoming a priest.[23]

---

[22]    Although the Complaint alleges that Defendants had "actual or constructive knowledge of Bossa sexually abusing children," Compl. ¶ 117(b), the only well-pled factual allegation involves the Pallottines' knowledge that Bossa had a sexual abuse conviction prior to his ordination.  *Id.* ¶ 3.  Other than the conclusory allegations that "Defendants had actual or constructive knowledge" of sexual abuse committed by Bossa after he became a priest, the Complaint is devoid of allegations reflecting how or when Defendants gained such knowledge.  *See supra* n.17.

One element of Plaintiff's general negligence claim may, if amended, be able to survive the discretionary function analysis, however.  Within Plaintiff's negligence claim, he alleges (i) negligent failure to warn Plaintiff, his parents, or legal guardians of Bossa's conduct; (ii) negligent failure to report Bossa's activities to law enforcement and parents; (iii) negligent failure to conduct a reasonable investigation of abuse complaints; and (iv) negligent failure to create, institute, or enforce policies preventing sexual abuse.  Compl. ¶¶ 117(b), 117(f)–(g), 118(d).  If Plaintiff can allege facts from which the Court can reasonably infer that Defendants knew Bossa was sexually abusing children *after* he became a priest, the 1962 Policy would have mandated secrecy outside the Church as to that abuse, *see* Ex. E ¶¶ 11, 70, and the negligent failure to warn, failure to report, failure to investigate, and failure to create policies elements of the negligence claim could confer subject-matter jurisdiction over the Holy See based on the non-discretionary actions of its employees.

[23]    In the alternative, the Court dismisses the Customary International Law claim for failure to state a claim.  The Holy See argues that the international laws Plaintiff attempts to enforce do not provide a private right of action.  Def. Mem. at 33 (citing *Joyner-El v. Giammarella*, No. 09-CV-3731, 2010 WL 1685957, at *3 n.4 (S.D.N.Y. Apr. 15, 2010); *Flores v. S. Peru Copper Corp.*, 414 F.3d 233, 258–59 (2d Cir. 2003); *Martinez-Lopez v. Gonzales*, 454 F.3d 500, 502 (5th Cir. 2006)).  Plaintiff has alleged violations of the Universal Declaration of Human Rights ("UDHR") and Convention on the Rights of the Child ("CRC").  Compl. ¶¶ 164–65.  As Plaintiff notes, *see* Pl. Opp. at 32, the Supreme Court allows for the recognition of a claim based on violations of Customary International Law if: (1) there is a specific, universal, and obligatory norm at issue and (2) the court finds it should exercise "judicial discretion" to create a cause of action.  *Nestle USA, Inc. v. Doe*, 141 S. Ct. 1931, 1938 (2021) (citing *Sosa v.*

In short, because the Complaint has not alleged facts that negate all discretion at the local level, the first step of the *Gaubert* test has been met, and the Court must proceed to consider its second prong. *Saint-Guillen v. United States*, 657 F. Supp. 2d 376, 386–87 (E.D.N.Y. 2009). Case-law is clear that decisions related to employment and supervision are exactly the kind of policy judgments that the discretionary exclusion was designed to shield. *Id.* Thus, both prongs of the discretionary function exclusion are met.

Because the negligent training, supervision, and retention and customary international law claims clearly fall within the discretionary function exclusion, those claims against the Holy See pursuant to *respondeat superior* are dismissed with prejudice. Plaintiff's broader negligence claim against the Holy See pursuant to *respondeat superior*, including his failure-to-warn and failure-to-report allegations, *see* Compl. ¶¶ 117(b), 117(f)–(g), 118(d), is dismissed without prejudice, because, although perhaps a steep uphill climb, Plaintiff could conceivably allege facts in an amended complaint demonstrating lack of discretion as to these actions.[24] Should Plaintiff seek leave to file an amended complaint, in order to establish subject-matter jurisdiction that amended complaint must plead sufficient facts from which the Court can reasonably infer that (i)

---

*Alvarez-Machain*, 542 U.S. 692, 732 (2004)). A court's creation of a cause of action is "an extraordinary act." *Id.* The Second Circuit has not yet committed such an extraordinary act in like circumstances. Lacking any argument from Plaintiff as to how Plaintiff's pleading meets the two-step *Sosa* test, the Court finds that this claim is not well-pled. Plaintiff's claim against the Holy See for vicarious liability based on violations of Customary International Law is therefore dismissed on this basis, in addition to the discretionary nature of the acts about which Plaintiff complains.

The Holy See also argues that, if Plaintiff could properly bring such a claim, it would be time-barred because, absent a statute of limitations, analogous law would create a six-year statute of limitations. Def. Mem. at 35. Because Plaintiff did not address this argument, the Court would also be within its discretion to dismiss the claim as abandoned. *Romeo & Juliette Laser Hair Removal, Inc. v. Assara I LLC*, No. 08-CV-442, 2014 WL 4723299, at *7 (S.D.N.Y. Sept. 23, 2014) ("At the motion to dismiss stage, where review is limited to the pleadings, a plaintiff abandons a claim by failing to address the defendant's arguments in support of dismissing that claim.") (citation omitted).

[24]     *See supra* n.22.

clergy at the Pallottines, Mt. Carmel Church, or the Archdiocese, or the Archbishop himself, were on notice of sexual abuse by Bossa *as a priest*, thereby implicating the secrecy element of the 1962 Policy; (ii) the clergy who had such knowledge maintained secrecy in the form of failing to warn parents, Plaintiff, or appropriate authorities because of their need to comply with the 1962 Policy; and (iii) the clergy who had such knowledge had no discretion to take other steps to warn relevant non-clergy, such as parents, Plaintiff himself, or authorities.[25]  If Plaintiff can allege that clergy were on notice and kept silent because of the mandatory secrecy aspects of the 1962 Policy, Plaintiff's *respondeat superior* negligence claim may survive the discretionary function exclusion and confer subject-matter jurisdiction over the Holy See.

### C.  Plaintiff Has Standing

Although the Court is granting the motion to dismiss, Defendant's argument that Plaintiff "fails to meet the traceability prong" required for Article III standing by failing to allege "facts linking the Holy See's conduct to his abuse" merits discussion.  Def. Mem. at 27–28; *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 579 (1992) (Kennedy, J., concurring).  Should Plaintiff seek leave to amend his Complaint, the only remaining claim available to him against the Holy See is based on *respondeat superior.*  Accordingly, although Plaintiff does not need to allege facts linking the Holy See's conduct to his abuse, he does need to allege facts linking the Holy See's employees to that abuse.  Currently, Plaintiff has alleged that employees of the Holy See allowed him to be the victim of child sexual abuse for years while he was in their care.  *See*, *e.g.*, Compl. ¶¶ 41, 80, 82, 85–87, 95–97, 99–100, 117(b)–(c), 118(a), 118(d).  Because Article III standing "requires no more than *de facto* causality," *Dep't of Com. v. New York*, 139 S. Ct. 2551, 2566

---

[25]      In light of the fact that Bossa had a public misdemeanor conviction involving sexual abuse of a minor prior to becoming a priest, the Court is skeptical that the Plaintiff will be able to allege facts tending to show that there was *no room* for discretionary action that would have resulted in adequate warnings to parishioners, at least as to the Pallottines.

(2019) (citation omitted), Plaintiff's alleged sexual abuse is fairly traceable to the supervising

clergy and Archbishop's alleged negligence.  As a result, the chain of causation from supervisory

clergy's alleged actions or inactions to the abuse Plaintiff allegedly suffered is not "so

attenuated" as to render the injury not "fairly traceable" to their actions.  Def. Mem. at 28

(citation omitted).

### D.  Failure to State a Claim

Because the Court is dismissing the Complaint as to the Holy See for lack of subject-

matter jurisdiction, the Court need not reach the question whether Plaintiff has stated a claim.

Nonetheless, as with standing, the parties' dispute merits discussion.

Defendant argues that Plaintiff fails to state a claim essentially for all claims, whether

premised on direct or vicarious liability.  Def. Mem. at 29–33.  Because the Court has already

dismissed all claims, the Court only addresses the arguments that implicate the *respondeat*

*superior* negligence claim that is being dismissed without prejudice.  Those arguments include

Defendant's constitutional argument against the imposition of vicarious liability generally and

Defendant's argument that the Child Victims Act ("CVA"), CPLR § 214-g, which revived the

statute of limitations for child sexual abuse claims in New York, is inapplicable to claims against

the Holy See.  *Id.* at 33–35.

### a.  Plaintiff's Vicarious Liability Theories Do Not Violate the First Amendment or Common Law

Defendant argues that Plaintiff's reliance on interpretations of religious doctrine to

demonstrate the Holy See's relationship to its employees violates the Establishment Clause, the

Free Exercise Clause, and the common law.  Def. Mem. at 29 (citing Compl. ¶¶ 33, 50).  The

three cases Defendant cites to support this proposition are all distinguishable.  *See*, *e.g.*, *Watson*

*v. Jones*, 80 U.S. 679, 733–34 (1872) (holding a court cannot rule on the truth or falsity of a

religious teaching); *Serbian Orthodox Diocese v. Milivojevich*, 426 U.S. 696, 707–23 (1976)

(holding courts cannot interpret and draw conclusions about intra-church law under the First and

Fourteenth Amendments); *Alford v. United States*, 116 F.3d 334, 339 (8th Cir. 1997) (refraining

from interpreting what constitutes a church matter as opposed to a secular one for purposes of

determining a minister's tax status).   Moreover, even if the Court were to strike the two out of

168 paragraphs of the Complaint that the Holy See argues impermissibly interpret religious

doctrine, *see* Compl. ¶¶ 33, 50, Plaintiff would still have sufficiently pled an employment

relationship for purposes of his Complaint.   Def. Mem. at 29.

**b.   Plaintiff's Claims of Child Sexual Abuse Are Within the CVA**

The Holy See argues the CVA does not apply to Plaintiff's claims, and therefore the

claims do not benefit from the CVA's tolling of the statute of limitations for child sexual abuse

claims.   Def. Mem. at 33–35.   The CVA applies to "every civil claim or cause of action brought

against *any party* alleging intentional or negligent acts or omissions by a *person* for physical,

psychological, or other injury or condition suffered as a result of" sexual abuse.   CPLR § 214-g

(emphasis added).   The Holy See argues that it is not a "person" either in its sovereign or

corporate form under New York law.   Def. Mem. at 33–34.   But the only claim that can be

revived against the Holy See under the CVA is restricted to negligence under a *respondeat

superior* theory based on the actions of employees of the Holy See (namely, the actions of the

Archbishop and other American clergy other than Bossa).   Those individuals constitute

"persons" under the statute, and the statute clearly states that the claim may be brought against

"any party," not limited to persons or to theories of direct, as opposed to vicarious, liability.   *See*

Pl. Opp. at 33.[26]  Therefore, Plaintiff's claim that is not being dismissed with prejudice is properly revived under the CVA.

**CONCLUSION**

Litigation involving foreign sovereigns can present complicated issues of law.  In its current iteration, Plaintiff's Complaint has not adequately alleged that this Court has subject-matter jurisdiction over the Holy See.  As a result, for the foregoing reasons, Plaintiff's claim of negligence on the basis of the alleged actions of employees of the Holy See is DISMISSED without prejudice, and all of his remaining claims against the Holy See are DISMISSED with prejudice.  If Plaintiff chooses to do so, he may seek leave to file an amended complaint not later than January 20, 2022.  If Plaintiff does not seek leave to file an amended complaint, the case shall be dismissed for lack of subject-matter jurisdiction.[27] The Clerk of Court is respectfully direct to close the open motion at Docket 74.

**SO ORDERED.**

**Date:  December 20, 2021**                                                   **VALERIE CAPRONI**
**        New York, NY**                                                        **United States District Judge**

---

[26]     The Court does not reach the question of whether the statute can encompass the acts or omissions of institutions because the remaining claim does not implicate that question.

[27]     The Court has only supplemental jurisdiction over the remaining Defendants.